LOCAL 50, BAKERY AND CONFEC-
TIONERY WORKERS UNION, AFL–
CIO, HEALTH BENEFITS FUND, and
Trustees of the Local 50 Bakery and
Confectionery Workers Union, AFL–
CIO, Health Benefits Fund, Plaintiffs,

v.

LOCAL 3, BAKERY AND CONFECTION-
ERY WORKERS UNION, AFL–CIO,
WELFARE FUND, and Trustees of the
Local 3, Bakery and Confectionery
Workers Union, AFL–CIO, Welfare
Fund, Defendants,

and

Entenmann's, Inc., Intervenor.

No. CV 80–1708.

United States District Court,
E.D. New York.

March 28, 1983.

MEMORANDUM & ORDER

PLATT, District Judge.

### I. INTRODUCTION

This is a dispute between one union local's (Local 50's) health benefits fund and a second union local's (Local 3's) welfare fund, and their respective trustees, over entitlement to monies now held in part by each fund. Both locals are unincorporated labor organizations, although each is a constituent of the Bakery and Confectionery Workers Union, AFL–CIO.

The instant lawsuit was precipitated by an August 8, 1979 representation election in which Bakery and Confectionery Workers Local 3 ousted Bakery and Confectionery Workers Local 50 as the collective bargaining agent for approximately 1300 employees of the Entenmann's, Inc. bakery in Bay Shore, Long Island. On September 1, 1979, as a result of that election, Local 3 assumed all duties and obligations of Local 50 under a collective bargaining agreement then in effect between the latter and Entenmann's. The agreement covered the period from May 1, 1977 to April 30, 1980. This, and all prior agreements, provided that Entenmann's would make contributions to the bargaining agent's welfare fund,[1] and that the bargaining agent would purchase an insurance policy providing a variety of group health and welfare benefits to bargaining unit members and their dependents. With this as background, we shall now outline each party's claim.

### A. LOCAL 50 FUND'S CLAIM

Plaintiffs, the Local 50, Bakery and Confectionery Workers Union, AFL–CIO, Health Benefits Fund, and its Trustees (hereinafter, the Local 50 Fund), paid to its insurance carrier $101,228.58, the premium due on September 1, 1979, to cover bargaining unit employees. However, the welfare fund contribution due on September 15, 1979—in the amount of $151,837.58 [2]—was paid by Entenmann's to the defendant, the Local 3, Bakery and Confectionery Workers Union, AFL–CIO, Welfare Fund, and its

---

1. We will refer generically to the Local 50 Health Benefits Fund and the Local 3 Welfare Fund as "welfare funds."

2. The Local 50 Fund's Amended Complaint (¶ 15, *et seq.*) refers to this amount as "approximately $125,000." However, the Pretrial Or-

Trustees (hereinafter, the Local 3 Fund), and not to the Local 50 Fund.[3]

The Local 50 Fund seeks declaratory and injunctive relief ordering the Local 3 Fund to (1) reimburse it for the $101,228.58 September 1, 1979 insurance payment; and (2) pay over to it the $151,837.58 contribution due September 15, 1979, which Entenmann's paid to the Local 3 Fund.

### B. LOCAL 3 FUND'S AND INTERVENOR'S CLAIMS

By order dated July 14, 1982, this Court permitted Entenmann's to file an intervenor complaint in this action. Both Entenmann's and, by way of a counterclaim asserted in its answer, the Local 3 Fund[4] seek a declaratory judgment, an accounting, and injunctive relief with regard to certain reserves remaining in the Local 50 Fund. As of October 1, 1979, these reserves amounted to approximately $3,450,416. That sum consists of contributions made by Entenmann's and by other employers whose employees are or were represented by Local 50. According to calculations developed by the Local 3 Fund, the portion of these reserves attributable to contributions by Entenmann's is at least $651,239. The Local 3 Fund seeks an order transferring this amount to it.

### C. THE PARTIES' MOTIONS

Both the Local 50 Fund and the Local 3 Fund (but not Entenmann's) now move for summary judgment on the claim of the Local 50 Fund. Both sides agree that no

factual issue remains in dispute as to this claim. In addition, Entenmann's moves for summary judgment on its complaint, as does the Local 3 Fund on its counterclaim. The Local 50 Fund likewise moves for summary judgment as to the claims of the defendant and the intervenor.

## II. DISCUSSION

### A. THE LOCAL 50 FUND'S CLAIM

■ 1. *Jurisdiction.* In a Memorandum & Order dated June 9, 1981, this Court held that the Local 50 Fund had properly pleaded jurisdiction under § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185 (1978), in view of its allegations as to the existence of three contracts (the first two of which involve the collective bargaining agreement): (1) between Entenmann's and Local 50; (2) between Entenmann's and Local 3; and (3) between Local 50 and Local 3 (the September, 1979 interfunds agreement). We see no reason to alter or supplement our discussion on that point. The Local 50 Fund also attempted to found jurisdiction upon LMRA § 302(c)(5)(B), 29 U.S.C. § 186(c)(5)(B) (1982), an issue that this Court did not need to decide in its June 9, 1981 Order. Plaintiffs have now abandoned this allegation, and we will not address it here.

2. *The Merits.* The facts are not in dispute. The Local 50 Fund's position rests entirely on the argument, not illogical on its face, that employer contributions to the fund are "retrospective," while insurance

der submitted in May, 1982 contains the larger figure.

3. These two payments were made pursuant to a September 17, 1979 agreement between the Local 50 Fund and the Local 3 Fund (interfunds agreement). That agreement also provided that (1) as of October 1, 1979, Entenmann's employees would no longer be eligible to receive benefits from the Local 50 Fund, but would become beneficiaries of the Local 3 Fund; (2) the October 1, 1979 insurance premium would be paid by the Local 3 Fund; and (3) the difference between the October 1, 1979 insurance premium payment and the September 15, 1979 welfare contribution would be held segregated by the Local 3 Fund.

Under this agreement, each party reserved the right to claim that it, and not the other, was entitled to the September 15, 1979 welfare contribution, and that the other side and not it should pay the September 1, 1979 insurance premium. Thus, the interfunds agreement was intended merely to expedite the transition of bargaining unit members from coverage by the Local 50 Fund to coverage by the Local 3 Fund. The agreement leaves open the issues we consider here.

4. Unless otherwise specified, for purposes of this motion we will refer to both the defendant and the intervenor as the "Local 3 Fund."

payments by the union are "prospective." To be specific, the Local 50 Fund contends that, because each contribution by Entenmann's on the fifteenth of a given month was calculated on the basis of hours worked by bargaining unit employees during the immediately preceding month,[5] the employer contribution "covered" the immediately preceding month. Conversely, insurance payments made on the first of a given month "covered" that month. Thus, according to this argument, the September 15, 1979 contribution by Entenmann's should have been paid to the Local 50 Fund and not the Local 3 Fund because it in effect was reimbursement for the Local 50 Fund's payment on August 1, 1979 of its group insurance premiums.[6] By this same line of reasoning, the Local 3 Fund should have paid the September 1, 1979 insurance premium because it would be (and was) reimbursed for it through the October 15, 1979 contribution from Entenmann's.

But here the Local 50 Fund's seemingly logical analysis breaks down. First of all, it should be obvious that mere calculation of employer welfare fund contributions on the basis of the number of hours worked in a given month does not necessarily mean those payments cover that month in the sense that they constitute reimbursement for insurance premiums. In a similar vein, insurance premium payments are not necessarily prospective vis-a-vis welfare fund contributions merely because the policy itself requires that the fund pay the premium before benefits are provided. Second, as a matter of common sense, we expect that a welfare fund would have to build up reserves before it could begin to pay insurance premiums. Thus, employer contributions should be prospective and premium payments retrospective, not the other way around.

Turning to the facts of the case as presented by the Local 3 Fund (and not disputed by the plaintiffs), it is clear that these observations are borne out. The collective bargaining agreement (¶ 19(b)) states in the following language that the employer's obligation to make welfare fund contributions accrues as soon as each employee starts work:

> The term "employee" for the purpose only of determining the employees for whom contributions shall be made and the amounts thereof, shall mean all of the Employer's employees for whom the Union is the Collective Bargaining Representative, commencing from the first date of employment.

Thus, although actual payment of the contribution for each employee may have occurred between 15 and 45 days after that employee joined Entenmann's, the payment "covered" the period beginning on that day and terminating at the end of the month. Conversely, the group insurance plan provided by the Local 50 Fund to members of the Entenmann's bargaining unit provides as follows:

> You will become insured for yourself and your dependents on the first day of the month following a period of three consecutive months during which you work at least 15 days a month.

Taken together, these two provisions clearly demonstrate that Entenmann's made at least two months of contributions to the Local 50 Fund, and at least one more month's obligation accrued, before the Local 50 Fund paid insurance premiums on behalf of any employee. Proceeding forward from the beginning, it is equally clear that the Local 50 Fund was obliged to pay the September 1, 1979 premium because it

---

5. This is spelled out in ¶ 19(c) of the collective bargaining agreement, which was in effect from May 1, 1977 to April 30, 1980. As noted in the text, Local 3 assumed the duties and obligations of that agreement after it replaced Local 50.

6. Although the record does not state the amount of the August payment, this is not an important omission: the insurance payments do not necessarily equal the employer's contributions to the fund. It is important, however, to note that premium payments and employer contributions constituted a *quid pro quo* (though not necessarily in that order).

had already been reimbursed for it by Entenmann's.[7]

The Local 50 Fund's argument also is undercut by the terms of the collective bargaining agreement in effect between Local 3 and Entenmann's at the time of the September 15, 1979 welfare fund contribution. The agreement (¶ 19(f)) states that

> All moneys paid [by Entenmann's] . . . will be used . . . for the purpose of the purchase of group insurance benefits for the employees [of Entenmann's] and their dependents . . . .

Thus, if the Local 3 Fund had paid over the September 15, 1979 welfare fund contribution to the Local 50 Fund, it would have done so in direct breach of its collective bargaining agreement—an agreement originally negotiated by Local 50.

█ We need not belabor this point, for it has been amply demonstrated that the Local 50 Fund's claim must fail. Therefore, as to it, the plaintiffs' motion for summary judgment is denied and the defendants' motion is granted.

### B. THE LOCAL 3 FUND'S AND INTERVENOR'S CLAIMS

. 1. *Jurisdiction.* In broadest outline, the Local 3 Fund alleges that jurisdiction exists over its counterclaim because the counterclaim either is compulsory under Fed.R. Civ.P. 13(a) or is properly ancillary, there being an independent basis for federal jurisdiction in LMRA § 302(c)(5). If jurisdiction exists over the Local 3 Fund's counterclaim, it will also exist over Entenmann's intervention.

The Local 3 Fund contends that its counterclaim is compulsory because, in the language of Fed.R.Civ.P. 13(a), it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . ." That transaction or occurrence is said to be "the change from Local 50 to Local 3 as the collective bargaining representative for Entenmann's employees, and the consequences of that event on the two Funds." Defendants' Brief, at 46.

In response, the Local 50 Fund argues that the claim and counterclaim involve entirely different transactions. Specifically, it points out that its claim focuses on the payment of a single welfare fund contribution (on September 15, 1979) and a single insurance premium payment (on September 1, 1979), while the Local 3 Fund's counterclaim places in issue the right to approximately 10 years of reserves accumulated by the Local 50 Fund. Plaintiffs' Reply Brief, at 2–4.

The determination of whether a party has set forth a compulsory counterclaim is complicated by "[t]he absence of any accepted test" to guide the courts. *Federman v. Empire Fire and Marine Insurance Co.,* 597 F.2d 798, 811 (2d Cir.1979). It appears that in analyzing this issue the Second Circuit generally considers three factors, no one of which is conclusive. They are:

> (1) identity of facts between original claim and counterclaim; (2) mutuality of proof; [and] (3) logical relationship between original claim and counterclaim.

*Id.,* 597 F.2d at 812. Here, the issue is further complicated by the failure of the parties to brief it extensively.

However, after considering each of these factors, we have doubts whether the Local 3 Fund's counterclaim is compulsory. First of all, most of the facts upon which the Local 50 Fund has relied in attempting to prove its claim appear to be quite different from those upon which the Local 3 Fund relies in its counterclaim. The former, as explained, involve the manner in which the

---

**7.** The Local 3 Fund might well have attempted to seek reimbursement for the October 1, 1979 insurance premium as well. Perhaps it did not do so because it would have had to assert its claim under LMRA § 301 and this would have cut directly counter to another argument against the Local 50 Fund's position—to wit, that a person not a party to or beneficiary of the contract upon which § 301 jurisdiction is based has no standing to sue and thus no claim to relief. In other words, the Local 3 Fund might have found itself in the position of arguing that the Local 50 Fund breached its collective bargaining agreement with Entenmann's— an agreement to which the Local 3 Fund was not a party (or beneficiary). However, because the defendants do not present this question, we do not decide it.

welfare fund contributions and insurance premium payments interrelate, and in particular, whether Entenmann's began to contribute to the Local 50 Fund prior to the time the Local 50 Fund began to make insurance premium contributions, or vice versa. The latter facts, as will be shown in greater detail below, involve quite different matters: the reserves accumulated by the Local 50 Fund, the purely legal question of whether the successor fund is entitled to a *pro rata* share based on prior contributions made on behalf of Entenmann's employees, and the manner in which that share should be calculated. Second, it follows that there will be little if any mutuality of proof as between the claim and counterclaim. Finally, although a logical relationship superficially exists between the two (they both "arise" out of the August 8, 1979 representation election), at a slightly deeper level they are quite dissimilar. The Local 50 Fund's claim, jurisdictionally based upon LMRA § 301, has the character of a contract dispute over the terms of the collective bargaining and welfare fund agreements, and pertains to two payments made within a short period. The Local 3 Fund's counterclaim, on the other hand, is based upon a substantively different provision of the LMRA, § 302(c)(5), brings into play equitable considerations, and involves numerous payments over a 10-year span.

However, in view of the fact that the funds which the parties claim are interrelated—i.e., at least some of the reserves sought by the Local 3 Fund might have accumulated as a direct result of the three-month gap identified in our earlier discussion—meritorious arguments might support the conclusion that the defendants' counterclaim is compulsory. However, given the factors identified above, we have some doubt as to this. In any event, the matter need not be resolved if this Court finds that the Local 3 Fund's counterclaim is permissive, Fed.R.Civ.P. 13(b), and sets forth an independent basis of federal jurisdiction. *Federman v. Empire Fire and Marine Ins. Co.,* 597 F.2d at 812.

The Local 3 Fund maintains that an independent jurisdictional basis exists in LMRA § 302(c)(5), which states in relevant part:

> (c) The provisions of this section [prohibiting employer payments] shall not be applicable ... (5) with respect to money ... paid to a trust fund established by such representative [of the employer's employees], for *the sole and exclusive benefit of the employees of such employer,* and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents). . . .

(emphasis added). According to the defendants, the Local 50 Fund violated this provision (the "sole and exclusive benefit" clause) and thus gave rise to federal jurisdiction when it retained welfare fund contributions, which had been made by Entenmann's on behalf of its Local 50 employees, beyond October 1, 1979—the point at which the former Local 50 members employed by Entenmann's became beneficiaries of the Local 3 Fund. This raises what seems to be a question of first impression.

As this Circuit stated in *Valle v. Joint Plumbing Industry Board,* 623 F.2d 196 (2d Cir.1980),

> Section 302(e) of the National Labor Relations Act, 29 U.S.C. § 186(e) (1976), grants federal courts jurisdiction to remedy "structural" defects in pension plans established pursuant to § 302(c)(5), 29 U.S.C. § 186(c)(5) (1976).

623 F.2d at 201, n. 8. *See, e.g., Riley v. MEBA Pension Trust,* 570 F.2d 406, 412 (2d Cir.1977); *Lugo v. Employees Retirement Fund of the Illumination Products Industry,* 529 F.2d 251, 254–56 (2d Cir.), *cert. denied,* 429 U.S. 826, 97 S.Ct. 81, 50 L.Ed.2d 88 (1976); *Haley v. Palatnik,* 509 F.2d 1038, 1040–41 (2d Cir.1975); *Bowers v. Ulpiano Casal, Inc.,* 393 F.2d 421, 424 (1st Cir.1968); *Kraft v. Felder,* 452 F.Supp. 933 (S.D.N.Y. 1978); *Mosley v. National Maritime Union Pension & Welfare Plan,* 438 F.Supp. 413, 418–20 (E.D.N.Y.1977); *Fase v. Seafarers Welfare and Pension Plan,* 432 F.Supp.

1037, 1039–40 (E.D.N.Y.1977), *appeal dismissed,* 574 F.2d 72 (2d Cir.1978).[8]

The nature of the "structural" defect will vary from case to case. Courts generally have explained the concept by negative implication. Thus, a defect will not be inferred from "conduct constituting no more than a simple breach of fiduciary duty . . .," *Haley v. Palatnik,* 509 F.2d at 1040, or from "violations of . . . standards of prudence in the administration of [a] trust fund," *Bowers v. Ulpiano Casal, Inc.,* 393 F.2d at 424, or from "an individual claim of misadministration," *Mosley v. Nat'l Maritime Union Pension & Welfare Plan,* 438 F.Supp. at 418, or from the question of "whether the application of rules of a jointly-administered pension trust to an individual claim was arbitrary and capricious," *Cuff v. Gleason,* 515 F.2d 127, 128 (2d Cir. 1975) (per curiam); *see Lugo v. Emp. Retire. Fund of Illumination Prod. Ind.,* 529 F.2d at 255, or from "questions of day-to-day fiduciary administration of welfare and pension funds," *Alvares v. Erickson,* 514 F.2d 156, 165 (9th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106 (1975).

Only the First Circuit has attempted to provide a comprehensive definition of the "structural" violation:

> Such * * * violations would consist of contributions to a trust fund which was not established for the sole and exclusive benefit of employees and dependents; which did not hold payments in trust to pay from principal or income, for such employees' medical care, pensions, illness, etc.; which did not set forth in writing the detailed basis of payments; which did not have equal representation of employees and employers with provision for a neutral person or umpire; which did not contain provisions for an annual audit; or which did not have a separate trust for pension and annuity funds.

*Bowers v. Ulpiano Casal, Inc.,* 393 F.2d at 424 n. 4. This Circuit has endorsed that definition, describing it as a "narrow view of the scope of section 302(e)." [9] *Lugo v. Emp. Retire. Fund of Illumination Prod. Ind.,* 529 F.2d at 255 & n. 7.

However, in adopting this "narrow view," the Second Circuit has merely rejected "the notion that § 302(c)(5) [and § 302(e)] gave the federal courts a roving jurisdiction over . . . the structure of pension plans." *Riley v. MEBA Pension Trust,* 570 F.2d at 412. Moreover, recent Second Circuit decisions confer jurisdiction over claims that are no more "structural" (and, in some instances, far less) than the one asserted by the Local 3 Fund here.

For example, in *Lugo v. Emp. Retire. Fund, supra,* plaintiff challenged the defendant fund's (1) failure to provide him with an opportunity to be heard by the fund's pension committee prior to the denial of his disability pension, and (2) minimum employment requirement of 90 months during the 10 years preceding the date an application for benefits is made. Although the Court upheld on the merits the trial judge's determination that employees received sufficient protection absent a hearing requirement, and found that another, unchallenged rule independently barred the plaintiff from obtaining a pension, it first concluded that it had jurisdiction to review the plaintiff's substantive claims. The Court quoted with approval Trial Judge John R. Bartels' analysis of the jurisdictional inquiry:

> Plaintiff having alleged that the trust fund is not "for the sole and exclusive benefit of the employees" by reason of the exclusive eligibility requirements, the Court has jurisdiction to determine whether the trust agreement in fact satisfies the statutory standards of Section 302 . . . .

---

**8.** For purposes of our jurisdictional inquiry, nothing rests on the distinction between a pension plan and a welfare plan. *See Raymond v. Hoffmann,* 284 F.Supp. 596, 602 (E.D.Pa.1966), and *infra* note 14.

**9.** LMRA § 302(e), 29 U.S.C. § 186(e), gives United States District Courts jurisdiction "to restrain violations" of LMRA § 302, 29 U.S.C. § 186.

*Lugo v. Emp. Retire. Fund,* 529 F.2d at 255–56 (quoting 366 F.Supp. 99, 102 (E.D.N. Y.1973)).

In *Fase v. Seafarers Welfare and Pension Plan, supra,* plaintiff attacked the defendant plan as "wholly unreasonable and irrational" because it awarded prospective benefits only after a Social Security Administration finding of disability, which in his case had consumed three years. 432 F.Supp. at 1040. Noting that "[t]he challenge here is to the reasonableness of the [plan] provisions themselves," *id.,* we found jurisdiction to exist (and later granted summary judgment for the plaintiff).[10]

The case before us differs from *Lugo, Fase* and a number of others in that challenge is raised not to the soundness of a particular provision of a single plan, but rather to the manner in which funds were (or, here, were *not*) transferred to a successor plan after a change in collective bargaining representative brought about by vote of employees on whose behalf contributions were made to the predecessor plan. However, two cases from other circuits have held jurisdiction to exist on similar facts. In *Raymond v. Hoffmann,* 284 F.Supp. 596 (E.D.Pa.1966), the court declined to dismiss a complaint after finding that the refusal of the original trustees of a pension fund to "turn over an aliquot portion of the reserves" to the trustees of the successor fund might constitute a violation of § 302(c)(5). 284 F.Supp. at 600–01. And in *Alvares v. Erickson,* 514 F.2d 156 (9th Cir.1975), where a union local withdrew from a statewide bargaining unit and required affected employers to contribute to a newly created health and welfare trust fund, the court held that plaintiff's claim to a share of the reserves in the statewide unit's welfare fund was "structural" within the meaning of § 302. As the Ninth Circuit pointed out:

Before the withdrawal, the reserves were held for the benefit of all employees, statewide. After the withdrawal, and if the Local 32 members ceased to be beneficiaries, the number of beneficiaries was markedly reduced. Yet the State Trustees still have the same reserves, and appear to take the position that they are now held only for the benefit of beneficiaries other than the Local 32 members. Surely these changes do not involve mere administration of the trust. They involve a rather drastic change in its structure. The plaintiffs here are not seeking individual specific benefits that have been denied them.

514 F.2d at 165.

■ We are persuaded by *Raymond, Alvares,* and by decisions of this Circuit that the Local 3 Fund has properly alleged a structural violation of § 302(c)(5). Its counterclaim involves two welfare funds, a large group of employees, the manner in which an interfund transition occurred, and the funds in their entirety (rather than a particular provision thereof). In short, we hold that this Court has jurisdiction over the Local 3 Fund's counterclaim, and Entenmann's intervenor claim.

*2. The Merits.* Our jurisdictional inquiry must not be confused with an examination of the merits of the defendants' counterclaim and intervenor's claim. For, as we noted in *Fase v. Seafarers Welfare and Pension Plan,* "so long as plaintiff's claim that the [statute] has been violated is not 'wholly insubstantial and frivolous,' jurisdiction exists." 432 F.Supp. at 1040 (quoting *Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946)). Now we must consider whether the Local 3 Fund has made out a claim. In *Fase,* this second step was straightforward. It consisted of determining whether certain provisions of a single plan were "wholly unreasonable and irrational" in their operation. 432 F.Supp.

---

**10.** *Compare United Mine Workers of America Health and Retirement Funds v. Robinson,* 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982), which held that § 302(c)(5) does not impose a reasonableness requirement on plan provisions established by collective bargaining agreement rather than by the trustees. However, the Court left open the question of whether, in the latter case (applicable here), "federal courts sitting as courts of equity are authorized to enforce" the trustees' traditional fiduciary duties. 455 U.S. at 573 n. 12, 102 S.Ct. at 1233.

at 1040. Here, the issue in one sense is complicated by the fact that defendants do not attack a particular set of provisions; rather, their objections arise from the total absence of any provision addressing the transfer of reserves when a group of employees moves from one fund to another. However, in another sense, the issue is rendered simpler because here we do not have to make a factual determination as to the "unreasonableness" of particular provisions.

The Local 50 Fund in essence argues that it is entitled to retain the reserves because (1) the plaintiffs' refusal to transfer them was in fact an "administrative"—not a "structural"—decision that creates no cause of action under § 302(c)(5); (2) the "sole and exclusive benefit" requirement of § 302(c)(5) only constitutes a standard of qualification for establishment of trust funds and not an enforceable condition to their continued operation; (3) § 302(e) limits jurisdiction to the enjoining of criminal acts set forth in § 302(a)–(b); and (4) in the context of a pooled multi-employer fund, a group of employees of a single employer has no right to demand that the fund segregate contributions made on its behalf and use those contributions only for its benefit. We will consider these arguments in turn.

First of all, our discussion *supra* conclusively found that the Local 50 Fund's refusal was a "structural" and not an "administrative" act, and that therefore jurisdiction exists over the counterclaim. We believe that this aspect of the jurisdictional determination carries over to the merits, provided that plaintiffs' other arguments are well-founded. It is certainly true that the Local 50 Fund's retention of the reserves does not represent merely an administrative decision barred from our review. As noted, the instant conflict involves much more than a dispute over the rationality of a specific provision. It affects the composition of the substance or core of the Fund and thus is structural in the truest sense of the word.

Next we consider whether § 302(c)(5) requires only that welfare funds be *established* in conformity with the "sole and ex-

clusive benefit" clause. In support of their position, plaintiffs cite *Fiorelli v. Kelewer,* 339 F.Supp. 796 (E.D.Pa.1972), *aff'd mem.,* 474 F.2d 1340 (3d Cir.1973), an action by trustees of a local union pension against the trustees of a District Council pension trust, from which the local's members withdrew, to recover contributions made by employers on behalf of their employees. The District Court stated:

The issue raised * * * is whether, taken alone, that portion of the language in § 302(c)(5) which requires pension and welfare trusts to be 'established ... for the sole and exclusive benefit' of employees was intended by Congress to constitute a standard of qualification for the establishment of trust funds or whether it was intended to constitute an enforceable condition to the continuing operation of such funds. As applied to the facts of the present case this Court is of the opinion that Congress intended only the former.

339 F.Supp. at 799. While this language appears to support a contrary result, we are not bound by a decision of the Eastern District of Pennsylvania and believe that it should not be the law here. In addition, the Third Circuit in the subsequent case of *Nedd v. United Mine Workers of America,* 556 F.2d 190 (3d Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 757 (1978), without citing *Fiorelli,* took a more expansive view of § 302(c)(5), finding that "[n]othing in either the text of § 302 or in its legislative history suggests any hostility to damage remedies." 556 F.2d at 204.

■ Further support for our conclusion is drawn from the legislative history of § 302. In the words of Senator Ball, one of its sponsors, "all that [§ 302] really does is to protect the rights of employees to benefits out of these funds which are created by their own labor." 93 Cong.Rec. 5147 (1947) *reprinted in 2 Legislative History of the Labor Management Relations Act, 1947,* at 1498 (1948). If we were to adopt the plaintiffs' position, we would in effect be denying to the Entenmann's employees now in the Local 3 Fund monies that were contrib-

uted to the Local 50 Fund in lieu of being paid to those employees as wages. *See, e.g., Mosley v. Natl. Maritime Union Pension & Welfare Plan,* 438 F.Supp. at 420; *Bey v. Muldoon,* 223 F.Supp. 489, 495 (E.D. Pa.1963), *aff'd per curiam,* 354 F.2d 1005 (3d Cir.1966), *cert. denied,* 384 U.S. 987, 86 S.Ct. 1888, 16 L.Ed.2d 1004 (1966). In addition, plaintiffs' arguments are unsound as a matter of policy:

> To deprive [a union member of his potential benefits from a pension fund] because he shifts his allegiance to another union would seriously inhibit his freedom of choice, which is central to collective bargaining.

Summers, *Union Schism in Perspective,* 45 Va.L.Rev. 261, 279 n. 84 (1959) (quoted in *Alvares v. Erickson,* 514 F.2d at 163).[11] For these two basic reasons, we hold that claims under § 302 are not restricted to situations in which a fund is established in violation of the "sole and exclusive benefit" language. A fund consistent with § 302 at its inception may later be found to violate that section, whether through the introduction or omission of a single clause, or—as here— through the effects of an inter-union transfer of employees.

█ Plaintiffs' third argument is that § 302(e) limits jurisdiction to the enjoining of criminal acts. Although, in *Bowers v. Ulpiano Casal,* 393 F.2d at 424, the First Circuit stated that there is "no room for enjoinable violations which are not at the same time section 302 crimes," the more recent decisions of this Circuit do not support such a restrictive reading. For example, *Lugo v. Emp. Retire. Fund of Illumina-*

*tion Prod. Ind., supra,* reviewed the merits of objections that a procedural and a substantive provision of a fund were arbitrary and capricious. While *Lugo* joined *Bowers* in taking "a narrow view of the scope of section 302(e)," 529 F.2d at 255, it did not endorse or even mention the further limitation—application of § 302(e) only to enjoin criminal behavior—imposed by the First Circuit. Moreover, *Lugo* discussed the *Bowers* language only in considering the question of jurisdiction—as noted above, an inquiry satisfied merely by finding that a non-frivolous claim has been set forth. The *Lugo* court went on to note that, whether or not § 302(e) "confers on the federal courts the power to create a federal common law governing the management of pension plans ...,"

> it seems to us that the controversy is not about the jurisdictional provisions of section 302(e), but about the proper interpretation of the substantive requirements of section 302(c)(5).

529 F.2d at 255. Other cases from this Circuit support the conclusion that, whatever influence the *Bowers* decision has exerted, it does not prevent us from considering the structural counterclaim raised by the Local 3 Fund. *See, e.g., Valle v. Joint Plumbing Industry Board, supra; Haley v. Palatnik, supra; Mosley v. National Maritime Union Pension & Welfare Plan, supra.*

Finally, plaintiffs contend that prior case law bars our reaching into a pooled, multi-employer welfare fund to extract reserves attributable to a single group of employees who are no longer members of the fund. Their position may be summarized as follows:

---

11. This second reason supports the distinction between the case of an individual employee who disaffiliates himself from his union, and the case of a group of employees who either drop out of one union to form another or vote to join an already existing union. In the former case, the employee is not entitled to his aliquot share of existing reserves. In the latter, the group is. *See Alvares v. Erickson,* No. 8755, slip op. at 4 (W.D.Wash. Oct. 4, 1977). The instant situation also is to be distinguished from the one discussed in *Crawford v. Cianciulli,* 357 F.Supp. 357, 371 (E.D.Pa.1973). The District Court there held that "§ 302 *permits* [a] Pension Committee to continue payments to

employees of employers who have ceased making contributions to the Fund to the extent of any value of the employer's contributions which remain after the termination of contributions by that employer." The issue here is not whether the Local 50 Fund might have arranged to continue to pay benefits to the Entenmann's employees now in Local 3, but whether the Local 3 Fund is entitled to reserves paid on behalf of the former Local 50 members still employed by Entenmann's in order to continue to provide benefits consistent with the level of contributions made when those employees were members of Local 50.

A literal reading of Section 302(c)(5) emphasizing the limitation that the benefit be for the use of the 'employees of such employer' would require that each employee's benefit be 'traced' to the value of the payments by that employee's employer. We think this reading of Section 302(c)(5) is not warranted.

*Crawford v. Cianciulli*, 357 F.Supp. 357, 372 (E.D.Pa.1973). In addition, they rely heavily on *Local Union No. 5 of the Sheet Metal Workers' International Association v. Mahoning and Trumbull County Building Trades Welfare Fund*, 541 F.2d 636 (6th Cir.1976), where the court upheld an amended welfare fund rule that curtailed an employee's eligibility for benefits when his union ceased participating in the fund.

However, in *Mahoning and Trumbull*, two of the four factors cited by the Sixth Circuit—the absence of any intimation that the union engaged in bribery, extortion or misuse of funds, and evidence that the trustees adopted the rule in the legitimate interest of protecting the long-term viability of the fund—are not present here. (Moreover, the particular rule at issue in *Mahoning* is absent in this case). Concededly, the other two factors that the court relied upon are present here. The contributions of the local's employers will not benefit "outsiders" to the fund, and "the precipitating cause of the contributions being used for employees of other contributing employers is the Local *voluntary* action of withdrawal from the Fund rather than some involuntary act." *Id.* at 639 (emphasis added). We believe, though, that in *Mahoning and Trumbull* the Sixth Circuit has taken an overly narrow approach to § 302(c)(5)—one not endorsed by this Circuit—and that its holding presents union members with the untenable choice of either forfeiting the contingent right to contributions paid in lieu of wages or retaining a collective bargaining representative with which they are less than satisfied.

*Crawford v. Cianciulli, supra,* did not involve the issue presented to us here, but rather whether a fund could continue to pay benefits to employees on whose behalf an employer has made contributions in the past, but no longer does. The court held that it could, and stressed the inequity that would occur if it read § 302 to "eliminate an employee [sic] acquiring a 'vested' interest in a pension trust fund as a result of years of work with a contributing employer." 357 F.Supp. at 374. Furthermore, after reviewing the legislative history of § 302 (and emphasizing that "Congress considered these [benefit] payments as substitutes for wages or salaries normally paid directly to the worker," 357 F.Supp. at 373 (quoting *Bey v. Muldoon*, 223 F.Supp. at 495–96)), the court stated:

> Nor, presumably, did [Congress] want a union representing employes [sic] of more than one employer to use the funds provided by only one employer for the benefit of all the employes represented by the union without regard to which of the union members had earned the right to this payment.

*Id.*

The Local 50 Fund's position likewise would unfairly prevent Entenmann's employees from reaping some of the benefit of their "years of work." In addition, if Congress did not want a union to use funds contributed by one employer for some of its members to benefit its entire membership, it certainly could not have meant to permit a union fund to use employer contributions made on behalf of a group of former members to benefit all of its members except that group. We fail to see a material distinction between these two situations, and therefore conclude that plaintiffs' fourth argument is not persuasive.

■ It follows from the above discussion that the retention by the Local 50 Fund of contributions made on behalf of Entenmann's employees is "arbitrary and capricious" within the meaning of § 302(c)(5),[12]

**12.** It is worth noting that *Local Union No. 5 v. Mahoning and Trumbull*, 541 F.2d 636 (6th Cir. 1976), stated that "an eligibility standard ... conceivably could violate the 'sole and exclusive benefit' requirement without being 'arbitrary or capricious.'" 541 F.2d at 639.

and that therefore the Local 3 Fund has stated a valid claim for relief. In view of the absence of any factual issue raised by plaintiffs on this point,[13] we move directly to a consideration of the type of relief that we may grant.

3. *Scope of Relief.* It would seem odd indeed to have journeyed this far only to find that Congress did not permit us to transfer any of the reserves associated with the Local 3 members employed by Entenmann's from the Local 50 Fund to the Local 3 Fund. Yet LMRA § 302(e) confers on the federal district courts jurisdiction merely "to *restrain* violations" of § 302 (emphasis added). The issue thus is whether our power is limited to the enjoining of future § 302 violations, or whether—through application of general federal question jurisdiction—we may cure such violations by pressing into service the complete arsenal of equitable remedies.

The Second Circuit has not addressed this precise question, but in a recent and comprehensive opinion by Judge John J. Gibbons, the Third Circuit—in holding that it had the power to order an accounting to determine damages—concluded that (1) a common law cause of action for damages may be implied from § 302; (2) the "overall statutory purpose of § 302(c)(5) . . . [is] the preservation of the [welfare fund] trust corpus for its intended beneficiaries"; and (3) the common law damage action implied from § 302(c)(5) derives its jurisdictional basis from 28 U.S.C. §§ 1331, 1337—general

federal question jurisdiction. *Nedd v. United Mine Workers of America,* 556 F.2d 190, 203–06 (3d Cir.1977). Other cases support the conclusion that § 302 jurisdiction "will permit employment by the district courts of whatever equitable remedies may be needed to command obedience, by the trustees, to their contractual and statutory obligations." *Lewis v. Mill Ridge Coals, Inc.,* 298 F.2d 552, 558 (6th Cir.1962). *See, e.g., Alvares v. Erickson, supra; Copra v. Suro,* 236 F.2d 107, 117 (1st Cir.1956) ("district court will have the power . . . to effect an equitable resolution of the conflicting interests in the welfare plans and the accumulated contributions"); *Bath v. Pixler,* 283 F.Supp. 632, 635–36 (D.Colo.1968).

As noted above, this Circuit has not squarely held that we may order an accounting and transfer reserves in an action brought under §§ 302(e) and 302(c)(5). But several recent decisions strongly suggest that granting this type of equitable relief would not be frowned upon—particularly where, as here, we have found a valid claim to exist. For example, in *Fase v. Seafarers Welfare and Pension Plan, supra,* this Court granted summary judgment in favor of a plaintiff who sought to require a welfare and pension plan to cease withholding past pension benefits. In addition, *Lugo v. Emp. Retire. Fund of Illumination Prod. Inc., supra,* and *Mosley v. Nat'l Maritime Union Pension & Welfare Fund, supra,* implicitly rejected a narrow reading of a court's equitable powers under § 302.[14]

---

**13.** The Local 50 Fund might have raised an issue of fact by presenting evidence tending to show that its continued viability depended upon the retention of some or all of the reserves in question. *Compare Turner v. Local Union No. 302, Intl. Brotherhood of Teamsters,* 604 F.2d 1219 (9th Cir.1979); *Local Union No. 5 v. Mahoning and Trumbull,* 541 F.2d 636 (6th Cir.1976). In *Turner,* the Ninth Circuit held that a welfare fund amendment was not "arbitrary, unreasonable [or] nonfiduciary" where it was "adopted by trustees in their legitimate interest of protecting the 'long-term viability' of the fund and the trust fund is not used for the benefit of anyone other than employees of the contributing employers. . . ." 604 F.2d at 1228. In the case before us, the second condition apparently has been met, but plaintiffs have failed to satisfy the first.

**14.** The Local 50 Fund argues that the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461 (1982) pre-empts inter-fund transfer of welfare fund reserves because ERISA (1) explicitly distinguishes between pension funds and welfare funds; (2) provides a detailed procedure for transferring pension reserves when a contributing employer withdraws from the fund; and (3) says nothing about transferring welfare fund reserves. However, this omission, rather than pre-empting transfer, relegates resolution of the issue to LMRA § 302. This is made explicit by ERISA § 514(d), 29 U.S.C. § 1144(d) (1975), which states:

Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (ex-

In light of the above discussion, we hold that this Court has the power to order an accounting and to transfer reserves from the Local 50 Fund to the Local 3 Fund.[15]

4. *Calculation of Relief.* The Local 3 Fund has proposed an apparently straightforward formula by which its claimed reserves in the Local 50 Fund may be determined. Briefly, for each year that Entenmann's employees belonged to the Local 50 Fund, Entenmann's contribution to the fund is divided by the total contributions to the fund by all employers (including Entenmann's). This yields a fraction which is then multiplied by the reserves (i.e., net earnings) in or losses of the Local 50 Fund at the end of each fiscal year. The result is a figure representing the annual reserves (as profit) or the loss attributable to Entenmann's employees. In essence, reserves consist of employer contributions and earnings thereon, minus such expenses as insurance premiums, claims paid directly, and administrative costs. The reserves attributable to Entenmann's employees for each year of their membership in the Local 50 Fund are then added together to yield the total share of reserves—$651,239—to which the Local 3 Fund claims to be entitled.

The defendants' formula does not deal with three uncertainties, two of which—if resolved—would probably increase the Local 3 Fund's claim, while the other would reduce it. The first consists of the fact that, although Entenmann's employees joined the Local 50 Fund in May, 1968, records of reserves do not exist prior to the fiscal year ending February 28, 1971 (a fact not disputed by plaintiffs); thus, the Local 3 Fund makes no claim to its share of reserves (on the assumption that any existed) for fiscal 1969 and 1970.

The second uncertainty is that the defendants do not credit the Local 50 Fund for fiscal 1971 through 1980 earnings attributable to reserves that predated Entenmann's employees' entry into the fund. According to an audit performed by the firm of O'Keefe & McKay, the reserve balance as of March 1, 1970 was $811,044. Affidavit of Stephen L. Fine, Exhibit M. While plaintiffs assert that figures for Local 50 Fund reserve earnings prior to the Entenmann's employees' entrance "are available from the O'Keefe & McKay audits annexed to the Fine affidavit" (Plaintiffs' Brief at 52), they cite no portion of the record where those figures are to be found. And, as defendants point out, it is impossible without at least knowing the reserve figure as of May 1, 1968 to determine the extent to which the March 1, 1970 reserve amount of $811,044 is attributable to contributions prior to May, 1968, and the extent to which it is attributable to Entenmann's contributions in fiscal 1969 and 1970.

The third uncertainty—which conceivably might increase the Local 3 Fund's claim—

cept as provided in sections 1031 and 1137(b) of this title) or any rule or regulation issued under any such law.

The exceptions are inapplicable here. *See NLRB v. Amax Coal Co.,* 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981); *Adams v. Trustees of New Jersey Brewery Emp. Pension Trust Fund,* 670 F.2d 387 (3d Cir.1982).

15. State trust law, which is appropriately considered in the context of a § 302 challenge to the retention and use of pension or welfare fund assets, *Beam v. International Organization of Masters,* 511 F.2d 975, 979–80 (2d Cir.1975); *Mosley v. National Maritime Union Pension & Welfare Plan,* 438 F.Supp. 413, 419 n. 5 (E.D.N.Y.1977), also supports the conclusion that interfund transfer is a proper remedy here. For instance, in *Nicoletti v. Essenfeld,* 11 Misc.2d 197, 171 N.Y.S.2d 373 (Sup.Ct.1958), a group of employees were transferred from one local to another, and their employers stopped making contributions to their former welfare fund and began to contribute to their current fund. At the same time, the trustees of the former fund sought to pay over to the current fund a portion of the reserve in the former fund that had been accumulated from contributions made on behalf of these employees. Although the declaration of trust establishing the former fund was silent regarding such a transfer, the court approved it, noting *inter alia* that

> [W]here a reserve is accumulated in a welfare fund, the protection and advantages provided by that reserve should, in the absence of countervailing considerations, be enjoyed by the employees on whose behalf the reserve was accumulated.

11 Misc.2d at 200, 171 N.Y.S.2d at 377. *See Whalen v. O'Rourke,* 5 A.D.2d 156, 170 N.Y.S.2d 284 (1st Dep't 1958); *In Re Katz (Local 1115A, Health, Welfare & Service Fund),* 48 LRRM 2620 (Sup.Ct.N.Y.Cty.1961).

arises from its calculation of reserves for the portion of fiscal 1980 in which Entenmann's employees were members of the Local 50 Fund. This calculation will be discussed first. In fiscal 1980, the Entenmann's employees were beneficiaries of the Local 50 Fund from March 1, 1979 through September 30, 1979, a period of seven months. The Local 3 Fund has taken the total non-Entenmann's contributions for fiscal 1980 ($5,107,748) and multiplied it by $7/12$, yielding $2,979,519, the total non-Entenmann's contributions made during the time the Entenmann's employees were members of the Local 50 Fund. The Entenmann's contributions made during this period ($626,955) are then added back into this figure. The sum, $3,606,474, represents the total of all contributions during the seven-month period. At this point, the total Entenmann's contributions are divided by the total contributions for the seven-month period, yielding .1738. The Local 50 Fund's net income for fiscal 1980, $1,692,505, is then multiplied by $7/12$, producing a figure of $987,295, *approximately* the net income for the period in which Entenmann's employees were members of the Local 50 Fund. This is then multiplied by .1738, yielding $171,592, or the Entenmann's employees *approximate* share of the fiscal 1980 reserves. This is an approximate figure because it does not take into account the fact that the Local 50 Fund's income was greater during the first seven months because Entenmann's contributions were made during this period. Thus, if a more precise calculation could be performed—and defendants contend that it cannot be (a claim not disputed by plaintiffs)—the amount of fiscal 1980 reserves attributable to Entenmann's would be commensurately greater.

The plaintiffs' main attack on the Local 3 Fund's position centers on the manner in which the defendants have calculated the reserves that they claim. "Obviously," the

Local 50 Fund states in its brief (at 51), "the only way to calculate reserves attributable to Entenmann's is to look at the claims experience of those employees." Plaintiffs contend that the Local 3 Fund could have used existing records—specifically, claims forms submitted to the Local 50 Fund—to make such a calculation. That this alternate formula could have been employed, but was not, raises a material issue of fact preventing this Court from granting summary judgment in defendants' favor, according to the Local 50 Fund. Of course, plaintiffs claim that the uncertainties discussed above (at least the first two) likewise raise a triable issue.

The Local 3 Fund attempts to justify its purportedly "logical, reasonable and equitable" formula (Defendants' Brief at 80) by analogy to the Multi-Employer Pension Plan Amendments Act of 1980 [MPPAA], P.L. 96–364, 94 Stat. 1208. While, as both sides acknowledge, Congress has not addressed the question of inter-fund transfer of welfare fund reserves, it has, in the MPPAA, recognized that "contribution ratios are the proper method for determining attributable portions of a fund." Defendants' Brief at 82. Rather than dealing with a transfer that follows employees from one fund to another, the MPPAA sets forth several methods for determining the obligation of a withdrawing employer to continue to fund the pension plan from which it withdraws so that the plan can meet its anticipated benefit commitments. *See* Legislative History of MPPAA, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.Code Cong. & Admin.News 2927. Three of the four methods prescribed by the MPPAA allocate unfunded withdrawal liability in proportion to the contribution history over the previous five years of all contributing employers compared to the contribution history over the same period of the withdrawing employer.[16] ERISA, §§ 4211(b), 4211(c)(2)–

16. The fourth method allocates unfunded liability according to the amount of service of particular employees for each of the employers for whom they worked. 29 U.S.C. § 1391(c)(4). The defendants argue that this "direct service" method has no application in the welfare fund

context because the concept of service is not used to determine welfare fund benefits. Although we might suggest an analogy, albeit a rough one, between the direct service method and (as plaintiffs urge) the use of claims experience to calculate entitlement to welfare fund

(4), 29 U.S.C. §§ 1391(b), 1391(c)(2)–(4). We need not describe each of these methods at length to note that the MPPAA's three contribution ratio methods, although involving somewhat the converse of the situation presented here, provide some basis for concluding that, were Congress to pass legislation governing the transfer of welfare fund reserves, it would adopt a variation of the method urged on us by the Local 3 Fund. Plaintiffs are incorrect in reasoning that, because "[h]ealth benefit funds simply are not concerned with these pension questions" (a debatable assertion), Congress would not employ the contribution ratio principle if it acted in the welfare fund area. Plaintiffs' Brief at 51. Furthermore, having concluded that the district courts have equitable power to transfer reserves between welfare funds, we may consider fair and reasonable methods for achieving that goal.

The Local 50 Fund provides virtually no discussion of its alternate method—calculation of reserves based on the claims experience of Entenmann's employees—an omission apparently intended to be excused by the contention that the Local 3 Fund could have employed this method by using existing records. There seems to be some question as to whether these records exist and in what form (*compare* Defendants' Brief at 81–82 *and* Defendants' Reply Brief at 40–41 *with* Plaintiffs' Brief at 51). However, even if we assume that they do and are usable, the Local 50 Fund, in opposing a motion for summary judgment, must do more than hint at the existence of an alternative formula. It at least must describe the formula and show, as a matter of logic if not fact, that it is truer to the purpose for which it is to be used than the one proposed by its adversaries. Plaintiffs have not done this. *Compare Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447 (2d Cir.1977); *W.L. Hailey & Co. v. County of Niagara,* 388 F.2d 746 (2d Cir.1967).

The Local 50 Fund's final hope in avoiding summary judgment rests on the second uncertainty discussed above—that defendants fail to take into account post-May, 1968 reserves that accrued due to pre-May, 1968 contributions by employers other than Entenmann's. As noted above, the reserve balance at the end of fiscal 1970 was $811,-044.

We are troubled by the magnitude of this uncertainty, particularly when compared with the other two identified earlier, and the possibility that it shrouds a significant sum that should be credited to the plaintiffs.[17]

This problem will be discussed in a moment. But first we wish to point out that, in cases involving calculation of damages based on a formula, numerous courts have held that absolute certainty is not a prerequisite to the granting of relief; reasonable certainty derived from reasonable calculations will suffice. *See Lee v. Joseph E. Seagram & Sons, Inc., supra; W.L. Hailey & Co. v. County of Niagara, supra; United States v. Sancolmar Ind., Inc.,* 347 F.Supp. 404 (E.D.N.Y.1972); *Levine v. Zerfuss Offset,* 492 F.Supp. 946 (S.D.N.Y.1980).

The Local 3 Fund bears the burden of proof on its motion for summary judgment.

| Fiscal Year | Net Reserves (Loss) |
| --- | --- |
| 1976 | $154,263 |
| 1977 | $408,168 |
| 1978 | $830,060 |
| 1979 | $826,961 |

It seems reasonable to conclude that losses may have been sustained in fiscal 1969 and 1970, too (as noted, records do not exist for those years). If this is the case, the Local 3 Fund should receive no credit at all for those years, and the entire reserve balance of $811,-044 remaining at the end of fiscal 1970 should be attributed to the Local 50 Fund.

reserves, Congress appears to have devoted more attention to methods concerned with contribution ratios.

17. It should be noted that the Local 50 Fund experienced sizeable losses in fiscal years 1971, 1972, and 1975, and that annual net reserves increased considerably towards the end of the relevant period:

| Fiscal Year | Net Reserves (Loss) |
| --- | --- |
| 1971 | ($ 32,968) |
| 1972 | ($111,864) |
| 1973 | $264,533 |
| 1974 | $194,094 |
| 1975 | ($ 70,126) |

While we do not necessarily believe that it has failed to sustain this burden, we conclude that—given the uncertain pedigree of the $811,044 in reserves remaining at the end of fiscal 1970—summary judgment should be granted on the basis of a formula that gives the plaintiffs full credit for the $811,044 reserve balance. In addition to the fact that the Local 3 Fund bears the burden of proof on its motion, the Local 50 Fund should be given the benefit of the doubt regarding the $811,044 because no evidence has been presented suggesting that the plaintiffs deliberately destroyed documentation that could shed light on the source of these reserves.

In short, although the defendants' method of calculation cannot be said to be unfair, this Court, in the exercise of its equitable power, has devised a method that is fairer. Its central feature consists of ensuring that the Local 50 Fund is credited with the full $811,044 sum,[18] and its starting point is the reserve sum—$3,450,416—in the Local 50 Fund as of October 1, 1979, the date on which the Local 3 Fund assumed responsibility for the Entenmann's employees. We proceed as follows:

(1) The reserves remaining at the end of fiscal 1970 are subtracted from the reserves in the Local 50 Fund as of October 1, 1979:

$$\begin{array}{r} \$3,450,416 \\ - \quad 811,044 \\ \hline \$2,639,372 \end{array}$$

**18.** An alternative method would have been to multiply the $811,044 by .138, the fiscal 1971 ratio of [Entenmann's contributions] to [total contributions to the Local 50 Fund] (see note 17, *infra*), on the theory that the ratios for the prior two fiscal years would have been similar. However, this would not determine the origin of the $811,044—the central problem here. Thus, in view of our discussion in the text, we will credit the entire amount to the plaintiffs.

**19.** This chart shows the relevant figures, and the resultant ratios, for the fiscal years in question. Each fiscal year begins on March 1.

| (1) Fiscal Year | (2) Total Contributions | (3) Entenmann's Contributions | (4) Ratio (Column 3: Column 2) |
|---|---|---|---|
| 1971 | 1,265,193 | 175,014 | .138 |
| 1972 | 1,707,582 | 288,190 | .169 |
| 1973 | 1,754,867 | 278,421 | .159 |

(2) The difference is then multiplied by .174, the average ratio of [the total contributions to the Local 50 Fund] to [the Entenmann's contributions to the Local 50 Fund] for fiscal 1970 through 1980 (the years for which records exist).[19] The result is the reserve sum attributable to the Local 3 Fund (as can be seen, it is $191,988 less than the $651,239 defendants seek in their counterclaim):

$$\begin{array}{r} \$2,639,372 \\ X \quad .174 \\ \hline \$ \ 459,251 \end{array}$$

(3) This product is then subtracted from the difference in line (1), yielding plaintiffs' share of the October 1, 1979 reserves (without yet taking into account the $811,044 figure):

$$\begin{array}{r} \$2,639,372 \\ - \quad 459,251 \\ \hline \$2,180,121 \end{array}$$

(4) The $811,044 in reserves remaining at the end of fiscal 1970 is then added to this difference. The sum is the Local 50 Fund's share of the October 1, 1979 reserves:

$$\begin{array}{r} \$2,180,121 \\ + \quad 811,044 \\ \hline \$2,991,165 \end{array}$$

Of course, when added together, the Local 50 Fund's share ($2,991,165) and the Local 3 Fund's share ($459,251) equal $3,450,416, the October 1, 1979 reserve amount.

| (1) Fiscal Year | (2) Total Contributions | (3) Entenmann's Contributions | (4) Ratio (Column 3: Column 2) |
|---|---|---|---|
| 1974 | 2,031,697 | 288,739 | .142 |
| 1975 | 2,116,508 | 330,419 | .156 |
| 1976 | 2,365,056 | 398,543 | .169 |
| 1977 | 2,999,636 | 541,683 | .181 |
| 1978 | 4,122,181 | 778,576 | .189 |
| 1979 | 5,659,666 | 1,286,202 | .227 |
| 1980 | 5,734,703 * [2,979,519] | 626,955 | .210 |

*The total contribution figure ($5,734,703) has been reduced, for purposes of this calculation, to $2,979,519—seven twelfths of $5,107,748—the total of all contributions minus the portion contributed by Entenmann's. This reflects the fact that Entenmann's contributed to the Local 50 Fund for only the first seven months of fiscal 1980.

With the above modification, defendants' motion for summary judgment will be granted, and $459,251 in reserves now held by the Local 50 Fund ordered transferred to the Local 3 Fund. Because plaintiffs have failed to set forth specific facts to support their assertion that defendants' formula is faulty and its calculations flawed, they do not raise any issue that must await resolution at trial. *See Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2727 (1983).

■ One further matter requires our attention. We are concerned that collective bargaining representatives like Local 3 in some instances may find it to the advantage of their respective welfare funds to lure employees from the employees' current collective bargaining representative. This problem would arise if the employee group moving from one fund to another brought with it reserves that increased the undivided per capita interest of all employees (i.e., both existing and incoming) in the successor fund over the undivided per capita interest of existing employees in the successor fund, prior to the arrival of the predecessor fund's employees or their reserves. In a situation like this, a welfare fund would have a potentially powerful incentive to convince an employee group to leave its current representative and that representative's fund. While it is true that courts do not (and may not) interfere when a group of employees votes to transfer its allegiance to a union that will better represent its interests (assuming that the transfer otherwise comports with applicable law), we believe that, when a court is exercising its general equitable power to order the interfund transfer of reserves, it should ensure only that the post-transfer position of the successor fund's employees is no better than the position of those employees prior to the transfer.

Therefore, although the defendants have fulfilled the formal requirements for summary judgment on their counterclaim, we will withhold the granting of their motion pending a hearing in which the Local 3 Fund will be required to demonstrate that, at the time of the transfer, the Local 3 Fund members (without the Entenmann's employees) held an undivided per capita interest in the Local 3 Fund equal to (or greater than) the undivided per capita interest the incoming Entenmann's employees would hold in the Local 3 Fund, taking into account the reserves defendants seek to transfer into that fund (as well as the reserves therein at the time the Local 3 Fund assumed responsibility for the Entenmann's employees). If the Local 3 Fund is unable to make this showing, we may find it necessary to order that the reserves accompanying the Entenmann's employees not be commingled with other reserves that may exist in the Local 3 Fund.

### III. CONCLUSION

With regard to the Local 50 Fund's claim, plaintiffs' motion for summary judgment is denied, and defendants' motion for summary judgment is granted. With regard to the Local 3 Fund's counterclaim, plaintiffs' motion for summary judgment as against both defendants and the intervenor also is denied, and defendants' and intervenor's motions—as modified—are granted. However, we withhold ordering the transfer of $459,251 from the Local 50 Fund to the Local 3 Fund pending a hearing to resolve the problem identified above. No costs.

SO ORDERED.