960 F.2d 1195
 140 L.R.R.M. (BNA) 2001, 121 Lab.Cas. P 10,097,
15 Employee Benefits Cas. 1074
 SHEET METAL WORKERS' LOCAL 28 OF NEW JERSEY WELFARE FUND;
Arthur Moore; William Viotle; Joseph Demark; Frank
Cregan; Andy Mihal; Richard Domanico; Sheet Metal
Workers' Local 20 of New Jersey Welfare Fund; Ralph A.
Quackenbush; Gilbert Nelson; Edward S. Burke; Michael
Ryan; Brian Deegan; Richard Bonner; Michael Losito;
Arthur Ford; Henry Pfeifer; June R. Pfeifer; Thomas
Welch; John Sirochman, Sr.; Milton Kubu; John Rupshis;
George Pace, Sr.; Sheet Metal Workers' International
Association Local 28; Sheet Metal Workers' International
Association Local 27; William G. Sullivan; Ronald Boyle;
Carol Ann Boyle
v.
Edward GALLAGHER, Trustee; Cornelius P. Sharkey, Jr.,
Trustee; Bernard Yamakaitis, Trustee; Harry Harris,
Trustee; Campbell Johnstone, Trustee; Eugene Morrison,
Trustee; Sheet Metal Workers' Local Union 22 of New Jersey
Welfare Fund.
SHEET METAL WORKERS' NATIONAL PENSION FUND; Sheet Metal
Workers International Association, Local 28; Sheet Metal
Workers International Association, Local 27; Edward J.
Carlough, Trustee; Robert T. Stringer, Trustee; C.T. Roff,
Trustee; Cavet Snyder, Trustee; Salvatore J. Cardella;
Rocco Cassio; Thomas Cofield; Francis Daughenti; Robert
Davis; Ernest E. Finizio; Arthur P. Ford; Lawrence A.
Fredericks; Ronald J. Gehring; Ronald N. Gedman; Herbert
Gunsaules; Matthew M. Hirsh; John Hyland; Milton J. Kubu;
George J. Martin; Robert J. Miller; June Nolan;
Frederick Rotz; George E. Schwerdt; John P. Sirochman;
Robert J. Smith; Henry Zaleski; Paul Vella
v.
Edward GALLAGHER, Trustee; Cornelius P. Sharkey, Jr.,
Trustee; Bernard Yamakaitis, Trustee; Harry Harris,
Trustee; Campbell Johnstone, Trustee; Eugene Morrison,
Trustee; Sheet Metal Workers Local Union 22 of New Jersey
Pension Fund.
 No. 91-5056.
 United States Court of Appeals,
Third Circuit.
 Argued June 13, 1991.
Decided April 3, 1992.
As Amended May 14, 1992.
 
 Theodore M. Lieverman (argued), James Katz, Mark Belland, Tomar, Simonoff, Adourian & O'Brien, Haddonfield, N.J., Raymond J. Sweeney, Washington, D.C., for appellants.
 John A. Craner (argued), Craner, Nelson, Satkin & Scheer, Scotch Plains, N.J., for appellees.
 Before: BECKER and ALITO, Circuit Judges, and HUYETT, District Judge.*
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This case arises from a dispute between two labor unions over the right to control a welfare fund and a pension fund. One union, an independent local, seceded from the other, an international union, and asserted control over the local's pension and welfare funds, which had previously been controlled by the international. After the secession, a subgroup within the independent returned to membership in locals affiliated with the international. The members of this subgroup believed that the trustees of the pension and welfare funds had breached their fiduciary duties by allowing the independent to assert control over the funds. Further, the members of this subgroup believed that they retained rights to monies in the independent pension and welfare funds that had been contributed on their behalf.
 
 
 2
 Consequently, the plaintiffs--a number of individuals who left the independent to return to locals affiliated with the international, the pension and welfare funds of the international and their trustees, and the locals affiliated with the international and their trustees--brought suit in the District Court for the District of New Jersey against the pension and welfare funds of the independent local and those funds' trustees. The plaintiffs sought to have control over the independent's pension and welfare funds returned to the international. Further, the plaintiffs sought to have the defendant funds disgorge to the plaintiff funds those assets in the defendant funds attributable to employees who left the independent to rejoin locals affiliated with the international.
 
 
 3
 The district court entered judgment in favor of the defendants, and plaintiffs appealed. This appeal requires us to decide whether the trustees of the independent local's benefit funds breached any fiduciary duties under the Employee Retirement Income Security Act (ERISA), 29 USC §§ 1001-1461 (1988), by refusing to disgorge monies from the funds and by designating the independent local as the union settlor for the fund. Further, we must determine whether a "structural defect" arises in employee benefit funds under Section 302(c)(5) of the Labor Management Relations Act (LMRA), 29 USC § 186(c)(5) (1988), when a fund retains monies contributed on behalf of employees who have left to join another union.
 
 
 4
 For the reasons that follow, we will affirm the district court's judgment with respect to the fiduciary duty issues but will reverse and remand for further proceedings to determine whether structural defects exist in the funds.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 5
 On October 16, 1981, plaintiff Edward J. Carlough, General President of the Sheet Metal Workers' International Association ("the International" or "SMWIA"), issued an order consolidating several of the International's locals in New Jersey into three larger locals. Carlough's order specifically directed that Local 22 of the SMWIA be disbanded and that its members be absorbed into SMWIA Locals 28, 27, and 19. Approximately 500 active journeymen and apprentices belonged to Local 22 at the time that the International ordered the merger. Under the Carlough plan, members of SMWIA Local 22 working in Union County and Morris County would become members of SMWIA Local 28, an existing local. After the merger, SMWIA Local 28 was to have within its territory both New York City and Northern New Jersey. Members of SMWIA Local 22 working in Somerset County were to become part of a new local, SMWIA Local 27, as would members of three other dismantled SMWIA locals.[1]
 
 
 6
 Under the terms of the merger order, Local 22 members were to receive credit in their new locals for time served in their old locals, which would be used in calculating their benefits and pensions. The International ordered Local 22's property and assets distributed proportionately to SMWIA Locals 27 and 28. The merger, in essence, contemplated that Local 22 would be dissolved and that its members would be treated as if they had always been members of their new locals.
 
 
 7
 At the time of the prescribed merger, Local 22 was party to a collective bargaining agreement with the Sheet Metal Contractors Association of Union, Morris, Somerset, and Sussex Counties ("the Contractors Association"), a group of thirteen employers in Northern New Jersey. It was also party to collective bargaining agreements with twenty-three contractors in Northern New Jersey who were not affiliated with the Contractors Association. The International proposed to treat Locals 27 and 28 as the "successors" to Local 22 under these collective bargaining agreements, that is, Locals 27 and 28 would assume all of the rights and responsibilities that Local 22 had previously held under the collective bargaining agreements with these employers.
 
 
 8
 As is often the case with the best-laid plans, the Carlough plan encountered difficulties. Some members of Local 22, including many of its officers, opposed the plan to dissolve their local. These members opposed the merger, at least in part, because they believed that the plan would deprive them of political power within their own union. While the merger plan preserved the benefits packages that members would receive, it would have concentrated power in the other members of Locals 27 and 28 and would have decreased the ability of the members of the former Local 22 to govern their own union. The Local 22 dissidents attempted to block the merger by appealing Carlough's order to the International's Executive Council. Their appeal was rejected.
 
 
 9
 The officers of Local 22 also went outside the union to undermine the planned merger, filing a complaint in New Jersey state court seeking to enjoin it. The International removed the case to federal district court and promptly counterclaimed against the Local 22 leadership, seeking to enjoin the leadership from interfering with the merger order. In December 1981, the district court dismissed the action against the International and granted the injunction against the officers of Local 22. See Sheet Metal Workers Int'l Ass'n Local Union No. 22 v Sheet Metal Workers International Association, Civ Nos 81-3414, 81-3415 (DNJ December 9, 1981). The court further ordered Local 22's officers to turn over all funds, books, records, and other property to the International.
 
 
 10
 About two weeks before the entry of the court's order directing the union to stop interfering with the merger and to turn over records, Local 22 held a meeting to discuss the future of its membership. At that meeting, a vote was taken among the approximately 300 members present to decide whether the membership wanted to disaffiliate from the International. The membership voted in favor of disaffiliation and created a new, independent local, the Sheet Metal Workers Local 22 of New Jersey ("the Independent" or "Independent Local 22"). The new local elected officers and drafted a charter and constitution.
 
 
 11
 After the federal district court in New Jersey entered the order barring Local 22's officers from interfering with the merger, the International moved to consolidate its position. It sought to merge the other locals and to have the Contractors Association recognize Locals 27 and 28 as the successors to Local 22.[2] This would have eliminated Independent Local 22 as a bargaining agent for employees of companies in the Contractors Association.
 
 
 12
 Independent Local 22 countered by filing a petition for representation with the National Labor Relations Board (NLRB) on January 6, 1982. The Local's petition claimed that Independent Local 22 was the collective bargaining agent for those employed within the Contractors Association, and it sought to have itself named as such. SMWIA Locals 19, 27, and 28 intervened and argued that they were the appropriate successors to Local 22 SMWIA. On April 28, 1982, the NLRB's Regional Director held that because "the entity formerly known as Local 22 has been disbanded and its separate identity has been destroyed," SMWIA Locals 19, 27, and 28 were not successors to Local 22 SMWIA. The Regional Director also ordered that an election be held to determine the appropriate bargaining agent for employees employed by members of the Contractors Association. The Director certified the appropriate unit for the election as consisting only of those employees who were employed by the Contractors Association and not all the employers who had formerly signed agreements with Local 22.[3]
 
 
 13
 While the petition was pending before the Regional Director, Independent Local 22 and Locals 19, 27, and 28 SMWIA entered into a stipulation that provided for a private election in lieu of an NLRB election if the Regional Director were to recognize Independent Local 22 as a bona fide labor organization and if the Regional Director were to hold that the existing collective bargaining contracts were not a bar to an election. The parties agreed that the election was to be conducted by the American Arbitration Association ("AAA"). The written stipulation provided that "the winner of the election [would] be recognized by its employers hereto as the collective bargaining agent as if the election had been conducted by the NLRB itself." The Agreement was signed by representatives from Independent Local 22, the International, and the Contractors Association. The agreed upon unit for the private election consisted of those employees who worked for members of the Contractors Association.[4] After the Regional Director ordered the election, and the Board declined to review the Regional Director's decision on August 10, 1982, the agreement for a private election became operative.
 
 
 14
 The parties then entered a second stipulation to govern the election. This stipulation provided that the Honest Ballot Association ("HBA") would conduct the election instead of the AAA. Independent Local 22 also agreed to withdraw its petition for Board certification with prejudice and to be bound by the result of the private election. The terms of the stipulations and the events of the campaign that preceded the private election are important because they evidence what the parties intended in agreeing to a private election. According to the stipulations, unit members would choose between representation by either Local 22 or a combined choice of Local 28 SMWIA, Local 27 SMWIA, and Local 19 SMWIA. In so choosing, unit members would be deciding who would be recognized by the employers as the "collective bargaining agent." Neither of the stipulations mentioned pension or welfare funds. Nonetheless, evidence was presented to the district court that the parties to the agreement considered control of the pension funds to be an issue in the election. Ronald Tobia, the attorney for the Contractors Association at the time that the stipulations were drafted, testified that his understanding of the negotiations was that the election was a vote on who would control the pension funds, in his words "an all-inclusive winner take all."
 
 
 15
 Defendant Campbell Johnstone, president of the Contractors Association and a trustee of the Local 22 Pension and Welfare Funds, testified that he also understood the agreement concerning the election to be a "winner take all" proposition. Defendant Edward Gallagher, another of the funds' trustees, testified to the same effect. Moreover, a letter that counsel for Independent Local 22 had sent to counsel for Locals 27, 28, and 19 stated:
 
 
 16
 Moreover, we have agreed in connection with the proceedings before the NLRB that in the event Locals 28, 27, and 19 prevail in the election that the present union trustees would resign and would be replaced in a manner yet to be decided upon. On the other hand, if Local 22 Independent is the winner, then we would expect [the president of Local 22, SMWIA, a supporter of the International] to likewise resign and those fringe benefit funds would be subject to control of the Independent Union. Any other conditions, the winner of the election will control the funds.
 
 
 17
 The ballot, however, stated a simple question: "Do you wish to be represented for purposes of collective bargaining by Local 22 [or] Local 28 SMWIA/ Local 27 SMWIA/ Local 19 SMWIA?"
 
 
 18
 In the campaign leading up to the election, both sides engaged in tactics that suggested to unit members that the issue of pensions was at stake in the upcoming balloting. On August 25, 1982, approximately two weeks prior to the September 10 election, Local 22's Independent Organizing Committee sent letters to members of the bargaining unit which stated:
 
 
 19
 Under our agreement with Locals 28, 27, and 19, as well as the Contractors' Association, the winner of the election will be deemed the lawful successor to Local 22, SMWIA. This means that should the Independent Union (Sheet Metal Workers' Local 22) win, it will name the Trustees who will control the assets of the Pension, Welfare, Annuity and other funds.
 
 
 20
 Independent Local 22 reiterated this promise in at least one other piece of campaign literature.
 
 
 21
 Locals 27 and 28 also suggested that the issue of control over pension funds was at stake in the election, although their behavior gave inconsistent signals to members of the bargaining unit about what would result from a Local 22 victory. In one letter, dated September 6, 1982, the Local 28 business manager stated the following: "If Local $ 22 won they would control your pension and welfare funds. You would have a long legal battle to regain your money." In contrast, the leadership of Local 27 was suggesting that pension funds were not an issue in the election. One of Local 27's campaign letters stated, "We suggest that although the Independent may represent you for bargaining a contract, serious doubt exists as to whether they can take the pension monies, which in the past have been contributed for you into a secure pension fund, away from the currently existing fund."
 
 
 22
 The election was held on September 10, 1982. Of the 468 valid votes cast, Independent Local 22 received 315 votes and the combined choice of Locals 28, 27, and 19 SMWIA received 153 votes. The Contractors Association then recognized Independent Local 22 as the collective bargaining agent for its employees. Several unaffiliated contractors also recognized Independent Local 22 as the collective bargaining agent for their employees.
 
 
 23
 After the election, the trustees of the Local 22 benefit funds moved to transfer control of the benefit funds from the International to the Independent. Prior to the election, there had been two jointly administered labor-management benefit funds for employees working in Local 22 SMWIA: the Local 22 Welfare Fund, a plan providing group life, accident and health coverage to employees; and the Local 22 Pension Fund, a trust entered into between Local 22 and the Contractors Association for payment of pensions to covered employees after retirement.
 
 
 24
 The Pension Fund, created by a declaration of trust, had three labor and three management trustees, all of whom are named as defendants in this suit. Pursuant to the collective bargaining agreement, employers in the Contractors Association made payments to the two funds based on the number of hours worked by employees. The trust creating the Pension Fund declared that three of the trustees "shall be designated as Employer Trustees and three ... shall be designated as Union Trustees." The trust defined the union settlor as "Sheet Metal Workers' International Association Local $ 22." The Welfare Fund contained a similar provision concerning appointment of trustees and designating the union settlor as Local 22 SMWIA. After the HBA election, the trustees of both funds executed new declarations of trust. Designation of the funds' union settlor was changed from SMWIA Local 22 to "Sheet Metal Workers' Local Union No. 22 of New Jersey Independent". All references in the funds' declarations of trust to "the union" were clarified to mean Independent Local 22.
 
 
 25
 In response to these actions by Independent Local 22, the various locals affiliated with the International began a campaign to become the bargaining agent for employees of those employers who formerly had agreements with Local 22 SMWIA but who were not parties to, and hence not bound by, the HBA election. The International's campaign was bolstered when the NLRB, in various decisions in 1983 and 1984, refused to recognize Independent Local 22 as the successor bargaining agent to Local 22 SMWIA for any employers outside the Contractors Association. Eleven such unaffiliated contractors who had formerly recognized Local 22 SMWIA refused to recognize Independent Local 22, and the NLRB rejected Independent Local 22's claim that these employers had committed unfair labor practices in refusing to bargain. The NLRB also rejected Independent Local 22's motions to intervene in various cases where Locals 27 and 28 had filed petitions to represent the employees of twelve employers who formerly had had collective bargaining agreements with Local 22 SMWIA.
 
 
 26
 Throughout 1983 and 1984, nine of the unaffiliated employers (Consolidated Steel, Nielsen Smith, Tri-County Erectors, Ameri-Craft, Par Sheet Metal, National Roofing, P & L Construction, Pioneer, and Gale Noise) recognized either Local 27 or Local 28 voluntarily, and the International hence withdrew its petitions for elections with those employers. At one employer, FHC, the NLRB conducted an election in which Local 28 SMWIA was the winner. Certain other members defected from Independent Local 22 without voluntary recognition from their employer or an NLRB election. As a consequence of these changes in collective bargaining representation, by October 1, 1985, Independent Local 22 had lost 159 members to either Local 27 or Local 28.
 
 
 27
 These transfers in membership affected the benefits and pension rights that transferring employees received. Under the Independent Local 22 Welfare Plan, employees received coverage for six months after leaving covered employment with Independent Local 22 and going to work elsewhere. At the end of six months, those employees who left Independent Local 22 and joined either Local 27 SMWIA or Local 28 SMWIA began to receive coverage from their new locals' welfare funds, and coverage by Independent Local 22 terminated. Although the plaintiff-beneficiaries of the Independent Local 22 Welfare Fund never lost coverage, they contended at trial that a surplus of funds had built up in the Local 22 Welfare Fund, in part because of contributions made on their behalf, and that they were deprived of their proportional share of those funds when they chose to transfer back to the International.
 
 
 28
 The Independent Local 22 Pension Fund paid pension benefits upon retirement only to those who had worked within Local 22 (whether in its old or new incarnation) for ten years. The rights to a pension for those employees who had worked in Local 22 for less than ten years were considered never to have vested; consequently, those with less than ten years experience who left Independent Local 22 to join one of the International's locals lost all rights to a pension from the Independent Local 22 Pension Fund. Upon affiliation with Locals 27 and 28, however, former members of Independent Local 22 had their pension credits and rights transferred to the National Pension Fund of the Sheet Metal Workers International. Thus, for example, an employee with five years experience working in Local 22 who transferred to Local 27 lost all entitlement to a pension from the Independent Local 22 Pension Fund. He would, however, receive credit for those five years from the National Pension Fund and his pension would thus be unaffected by the transfer. Because of the structure of these policies, no employees ever lost welfare benefits or pension credits as a result of transferring from Local 22 Independent to one of the International's locals. Nevertheless, the National Pension Fund of the SMWIA must pay benefits for which it received no corresponding employer contributions.
 
 
 29
 The present lawsuits arose from a dispute about whether the Independent Local 22 Pension and Welfare Funds are responsible for turning over to the International's pension and welfare funds monies sufficient to cover those employees who left the Independent to join the International after the HBA election. The International and its Pension Fund and leadership brought two separate lawsuits, now consolidated. The first suit, filed on October 23, 1986 in the United States District Court for the Southern District of New York, was brought by the National Pension Fund of the SMWIA against the trustees of the Local 22 Pension Fund and the Pension Fund itself. That court transferred the matter to the district court for the District of New Jersey. After the transfer of this suit, Locals 27 and 28, the trustees of their welfare funds, and several former members of Independent Local 22 who were later members of International locals, brought a second suit in the district court for the District of New Jersey against the Local 22 Independent Welfare Fund and its trustees. The two suits were then consolidated.
 
 
 30
 Both suits contained essentially the same allegations: that there were "structural defects" in the Local 22 Welfare and Pension Funds under Section 302(c)(5) of the LMRA and under ERISA because those funds had refused to transfer an aliquot share of assets to the plaintiff benefit funds, representing the proportion contributed on behalf of the transferring members; that the defendant trustees had breached their fiduciary duties under Section 404 of ERISA by changing designation of the union settlor under the funds to "Independent Local 22"; and that defendants had breached their common law fiduciary duties by not acting on behalf of all the beneficiaries of the trust. Primarily, the plaintiffs sought equitable relief in the form of an order directing that the funds be restructured and an order declaring that Independent Local 22 is not the appropriate union settlor of the Local 22 funds. Plaintiffs also sought removal of the trustees from the pension and welfare funds because of their alleged breach of ERISA and common law fiduciary duties.
 
 
 31
 The district court initially granted the plaintiffs' motion for summary judgment on the Welfare Fund claim. The court determined that, as a matter of law, there was a structural defect in the Welfare Fund because, in its view, Independent Local 22 was not the appropriate union settlor of the Welfare Fund. With respect to the Pension Fund, however, the court found, as a matter of law, that there was not a structural defect. The district court later reversed itself as to the Welfare Fund issue and found that there was a triable issue of fact as to whether the election determined that Local 22 Independent was the appropriate settlor of the welfare fund. The district court also found on summary judgment that there were no breaches of common law fiduciary duty. The balance of the case proceeded to a bench trial.
 
 
 32
 After trial, the district court reaffirmed its earlier conclusion that, as a matter of law, there was no defect with respect to the Pension Fund under either ERISA or the LMRA. The court noted that those employees who left Independent Local 22 with more than 10 years of service had vested pensions which would not be affected by the employees' departure. Those with less than ten years of service in Local 22 never obtained rights to a pension because ten years of service was a prerequisite to vesting of pension rights. The court determined that pension rights were therefore unaffected by departure, and that employees affiliated with Independent Local 22 who left had no entitlement to payment of pension benefits from Local 22's fund. Finding that there was no actuarial loss to the National Pension Fund resulting from Local 22 Independent Pension Fund's refusal to disgorge a proportionate share, the court concluded that the Independent Pension Fund did not contain a structural defect.
 
 
 33
 The district court further held that that there was no structural defect in the Welfare Fund. Reasoning that the HBA election was indeed a "winner take all" election, the court found that the parties intended the winner of the election to be the settlor of the funds. For that reason, the district court found no structural defect or breach of fiduciary duty in the appointment of Independent Local 22 as settlor of the funds. Nor did the district court find that the alleged loss of contributions by the departing members of Independent Local 22 created a structural defect. The court found that "none of the departing employees has lost any pension or welfare benefits to which they were entitled," and accordingly held that, because the International's funds were able to pay all benefits to which members of the International who had left Independent Local 22 were entitled, no structural defect arose. The court further found that all of the departures from Independent Local 22 were "voluntary" and held that employees who voluntarily depart from a certified bargaining unit do not have the right to compel that bargaining unit's pension or welfare funds to disgorge a proportionate share of those pensions to the departing members.
 
 
 34
 The court also reiterated its earlier holding that there were no breaches of common law fiduciary duty and held that there were no breaches of fiduciary duty under ERISA. Because the HBA election put the identity of the union settlor validly at issue, the court reasoned that it was not a breach of fiduciary duty to redesignate the union settlor for both of the funds. The district court consequently entered judgment in favor of the defendants on all counts.
 
 
 35
 Plaintiffs filed a timely appeal from this final judgment. We have appellate jurisdiction under 28 USC § 1291 (1988).
 
 
 36
 II. DESIGNATION OF THE APPROPRIATE UNION SETTLOR OF THE
 
 PENSION AND WELFARE FUNDS
 A. Introduction
 
 37
 Before determining whether the defendant Funds suffered from a structural defect, we must first consider whether the current settlor of those funds, designated as "Sheet Metal Workers Local Union No. 22 of New Jersey Independent," is the appropriate settlor. If so, defendant trustees did not breach a fiduciary duty, see 29 USC § 1104 (1988), in changing the designation of the union settlor from the International to Independent Local 22. If, however, as plaintiffs contend, changing the designation of the union settlor constituted a breach of fiduciary duty, then we must invalidate the amendment designating Independent Local 22 as the settlor, which would likely result in the International assuming control of both Independent Local 22 Funds.[5] Such a decision would eliminate the need for determining whether the fund suffers from a structural defect because the International would again assume control over the totality of the funds, a result that would subsume its request for a partial disgorgement of the funds' monies.
 
 
 38
 The initial focus of inquiry in analyzing this breach of fiduciary duty question is the HBA election, which determined that Independent Local 22 was the "collective bargaining agent" for those employees working within the Contractors Association. Plaintiffs vigorously dispute that the HBA election entitled the Independent to change the settlor of the Local 22 Welfare Fund and the Pension Fund. They argue that the identity of the union settlor was not at stake in the HBA election and, consequently, that the trustees had no authority to alter the terms of the trust agreement.
 
 
 39
 Further, the plaintiffs contend that, even if the parties to the HBA Agreement believed that the designation was at stake, the trustees of the two funds could not, through their own actions, change the designation of the union settlor. They submit that such a unilateral alteration on the part of the trustees would be contrary to the prior terms of the Funds' plan documents, and hence would violate Section 404 of ERISA, 29 USCA § 1104(a)(1)(D) (West 1985 and Supp 1991). Therefore, we must analyze both the nature of the HBA Agreement and the nature of the trustees' obligations under the plan documents governing the Welfare Fund and the Pension Fund to decide whether there was a breach of fiduciary duty in changing the designation of the union settlor.
 
 B. The HBA Election
 
 40
 1. Plain Meaning of the HBA Agreement and Ballot
 
 
 41
 The parties do not dispute that, before the HBA election in September, 1982, the designated union settlor for both the Pension Fund and the Welfare Fund was SMWIA Local 22. The parties do dispute, however, whether that designation was at stake in the HBA election. Our analysis begins with the terms of the HBA agreement.
 
 
 42
 The agreement between the International and Independent Local 22 provided that the parties would enter into an election conducted by a private arbiter, "in a unit consisting of all journeymen and apprentices ... with the winner of the election to be recognized by the employers hereto as the collective bargaining agent as if the election had been conducted by the NLRB itself." Nowhere did the agreement or the supplemental agreement specifically mention either of the benefit funds. Consequently, plaintiffs claim that the absence of reference to the benefit funds suggests that the parties did not intend the election to change the union settlor of the funds, and that the International should still be considered the settlor of the funds.
 
 
 43
 The district court, in finding for the defendants, construed the term "collective bargaining agent" in the HBA agreement as including the right to become the union settlor of the funds. The court held that the term "collective bargaining agent" encompasses "a bundle of rights," including the right to be union settlor of benefit funds. But, as the plaintiffs point out, the term "collective bargaining agent" does not on its face obviously include the right to serve as the settlor of benefit funds. Indeed, that term primarily suggests the right to serve the union membership in a bargaining capacity rather than as a fiduciary. However, we are not persuaded that the term "collective bargaining agent" could never include the right to become the settlor for a benefit fund.[6] Instead, we believe that the agreement is ambiguous on that issue.
 
 
 44
 We also note that the question on the HBA ballot did not obviously suggest that control of the pension funds was at stake. The ballot simply asked, "Do you wish to be represented for purposes of collective bargaining by Local 22 [or] Local 28 SMWIA/ Local 27 SMWIA/ Local 19 SMWIA?" Again, while we do not find it per se unreasonable that those voting in the election might have believed control of the pension funds to be a subject of the election, we cannot say that that fact was clear from the terms of the question. Hence, given the ambiguity of both the HBA Agreement and the ballot question, we turn to extrinsic evidence to decide whether the designation of settlor was validly at stake in the HBA election.
 
 2. Evidence Regarding the Parties' Intent
 
 45
 The district court made a finding of fact, based on evidence extrinsic to the HBA agreement, that the parties intended the September 1982 election to be a "winner take all" election, including the right to determine who would be union settlor of the fund. Plaintiffs urge that that finding was incorrect; we review the finding for clear error, see C.T. Bedwell & Sons v. Int'l. Fidelity Insurance Co., 843 F.2d 683, 691 (3d Cir.1988). We will uphold the district court's finding if "the district court's account of the evidence is plausible in light of the record viewed in its entirety." Anderson v. City of Bessemer, 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).
 
 
 46
 Several pieces of evidence in the record support the inference that the parties intended the designation of the union settlor to be at stake in the HBA election. First, there was testimony at trial that the parties meant to put the designation of the union settlor at stake in the election. Ronald Tobia, the attorney for the Contractors Association, testified that he believed, based on the negotiations preceding the agreement, that the agreement meant that the winner of the election would win the right to control the two benefit funds. Campbell Johnstone, president of the Contractors Association and a signatory to the agreement, testified that he believed that the election was a "winner-take-all" election, including "bargaining rights, ... the representation of employees ... adjustment of the grievances, welfare pension plan and everything with it." Defendant Edward Gallagher, a Local 22 Welfare and Pension Fund trustee, testified to the same effect.
 
 
 47
 Evidence at trial about the campaign literature circulated prior to the September 1982 election also supported the conclusion that the parties that believed that the winner of the election would control the pension funds. This included not only a letter from the Independent to members of the unit in August 1982, but also literature distributed by the International. Local 28's business manager circulated one letter stating, "If Local $ 22 won, they would control your pension and welfare funds." Although other elements in the International were perhaps suggesting the contrary,[7] the district court determined, based on all of the evidence, that the parties and the beneficiaries of the funds believed that control of the funds was at stake. Given such a substantial evidentiary basis, we cannot say that the district court's finding was clearly erroneous.[8] Hence, given the ambiguity of the agreement leading up to the September 1982 election, we defer to the district court's finding of fact that the parties intended to put the designation of the union settlor at issue.
 
 
 48
 C. Was Such Amendment Permissible?
 
 
 49
 The plaintiffs argue that, even if the parties believed that designation of the union settlor was at stake in the HBA election, the trustees were incapable of amending the plan documents to alter the designation of the union settlor of the funds. According to the plaintiffs, the amendment changing the designation of the union settlor was therefore a breach of fiduciary duty under Section 404(a)(1)(D) of ERISA, 29 USCA § 1104(a)(1)(D) (West 1985 and Supp 1991).
 
 
 50
 We disagree. Nothing in the plan documents for either fund specifically forbade amending them to redesignate the union settlor. Indeed, the only limitation on the trustees' amendment power was that the trustees could not change the purpose of the trusts. As the district court noted, the amendment changing designation of the union settlor did not change the purpose of either the Pension Plan or the Welfare Plan; it simply altered the designation of the union settlor from the union that formerly represented a majority of the beneficiaries to the union that subsequently represented a majority of the beneficiaries.[9] In sum, we do not believe that an amendment altering the designation of the Funds' union settlor violated the trustees' fiduciary duty.[10]
 
 
 51
 Therefore, we will uphold the district court's finding that the parties intended designation of the union settlor to be at stake in the HBA election. After the election, when the trustees of the Local 22 Welfare and Pension Funds redesignated the union settlor as Independent Local 22, they carried out this intent and acted in accord with the plan documents for the funds. We will therefore uphold the district court's finding that Independent Local 22 is the appropriate union settlor for both the Pension and Welfare Funds.
 
 
 52
 III. STRUCTURAL DEFECTS IN THE PENSION AND WELFARE FUNDS
 
 A. Introduction
 
 53
 Determination that the Independent has the right to be settlor of the Local 22 Welfare and Pension Fund does not end the inquiry. We must now determine whether those Funds and their trustees owe any duty to plaintiffs to disgorge funds to defendant funds in proportion to contributions made on behalf of those who departed. The crux of plaintiffs' claims is that the Local 22 Independent Welfare and Pension funds suffer from a "structural defect." Relying on the ERISA and LMRA jurisprudence in this and other circuits, plaintiffs argue that the failure to transfer funds in this instance impeded employees in the exercise of their rights to choose their own collective bargaining agent. See, for example, Molnar v. Wibbelt, 789 F.2d 244 (3d Cir.1986); Local 50 Bakery and Confectionery Workers Health Fund v. Local 3 Bakery and Confectionery Workers Welfare Fund, 561 F.Supp. 205 (E.D.N.Y.1983), affirmed in relevant part, 733 F.2d 229 (2d Cir.1984); Alvares v. Erickson, 514 F.2d 156 (9th Cir.1975); Bowers v. Ulpiano Casal, Inc., 393 F.2d 421 (1st Cir.1968). According to the plaintiffs, by conditioning payment of welfare and pension benefits on membership in Independent Local 22, the funds impeded employees' free choice of a collective bargaining agent.
 
 
 54
 We analyze this alleged defect to determine whether it justifies declaring the funds structurally defective and ordering the restructuring of the Local 22 Independent funds that plaintiffs seek. Initially, however, we examine the extant jurisprudence of structural defect, which, while still somewhat elusive, must be our guide in analyzing the alleged defects in this case.
 
 B. The Law of Structural Defect
 
 55
 Section 302(a) of the LMRA prohibits employers and their representatives from "pay[ing], lend[ing], or deliver[ing] any money or other thing of value" to unions and their officers. See 29 USC § 186(a) (1988). However, Section 302(c)(5) permits an exception for payments made "to a trust fund established for the sole and exclusive benefit of the employees of such employer, and their families and dependents." 29 USC § 186(c)(5) (1988). This exception only operates if the fund meets certain requirements: the fund must be established as a trust; it must be established by written agreement; it must have an equal number of labor and management trustees; pension funds must be kept separate from other welfare funds; and, consistent with the language of the statute, payments must be made for the sole and exclusive benefit of employees and their families. In situations where a fund established pursuant to Section 302(c)(5) runs afoul of these requirements, Congress has given courts jurisdiction to restrain such violations under Section 302(e) of the LMRA, 29 USC § 186(e) (1988). See Molnar, 789 F.2d at 248 (holding that jurisdiction to enjoin arises upon assertion of a structural violation in a benefit fund).
 
 
 56
 To enforce the Congressional command of Section 302(e), federal courts have reviewed trust funds for "structural defects," that is, conditions in the structure of a fund that violate the requirements of the LMRA, see Bowers 393 F.2d at 424 n. 4, or that inhibit employees in the free exercise of their collective bargaining rights. See Local 50, 561 F.Supp. at 214-15 (structural defect exists where benefit fund's refusal to disgorge funds would inhibit employees in exercise of their collective bargaining rights). Although such a definition is easily stated, recognizing structural defects in specific cases has proven difficult, and courts in this circuit and elsewhere have engaged in a tedious case-by-case analysis, producing what sometimes appear to be conflicting results.[11] Because no all-encompassing definition of structural defect has, as of yet, been stated, we will attempt to narrow the issue by identifying those categories of defects that are likely to be declared structural defects and hence subject to restraint by the courts.
 
 
 57
 It would be helpful at the outset to point out what is not a structural defect. Criticisms of the day-to-day operation of a fund are different in kind from allegations that the very structure of a fund itself is flawed and incapable of continuing operation in accord with the law absent restructuring. Hence, claims of the former kind are generally distinguished from cases of structural defect. For example, claims that the trustees have breached their fiduciary duty, see Haley v. Palatnik, 509 F.2d 1038, 1040 (2d Cir.1975), or complaints about the day-to-day operation of the trust are not actionable as structural defects. See Alvares v. Erickson, 514 F.2d 156, 165 (9th Cir.1975). Moreover, courts review allegations that a fund established pursuant to Section 302(c)(5) is violating its own rules only for arbitrariness and capriciousness and do not view such claims as claims of structural defect. See, for example, Struble v. New Jersey Brewery Employees' Welfare Trust Fund, 732 F.2d 325, 333 (3d Cir.1984).
 
 
 58
 Given that breaches of fiduciary duty and mere noncompliance with the terms of the trust are not structural defects, we must consider what claims do qualify as structural defects. Initially, we note that funds that do not comply with the black-letter requirements of § 302(c)(5) are structurally defective and subject to restraint and restructuring by the courts. For example, funds that do not have (or no longer have)[12] an equal number of labor and management trustees are structurally defective, see Molnar, 789 F.2d at 249, as are funds the charter for which is not contained in a written agreement. See id. Also, the language of the statute makes clear that if a fund does not separate pension and annuity funds from other types of funds, it is structurally defective. See 29 USC § 186(c)(5)(C). Finally, if a fund does not contain a provision calling for an annual audit, that fund is structurally defective. See Bowers, 393 F.2d at 424 n. 4. Structural defects of these kinds are readily discernible because courts can simply examine the trust agreement to determine whether it complies with these requirements of the statute.
 
 
 59
 The relevant inquiry in the present case is whether a fund, consistent with the statute, serves "the sole and exclusive benefit of the employees." Courts have had great difficulty with such cases. The "exclusive benefit" theory holds that, under 302(c)(5), all monies within a given fund must be for the benefit of those employees who are beneficiaries of the fund. If employees leave the coverage of a fund, they should, in theory, be able to carry with them their proportionate share of contribution to the fund. Taken to an extreme, this theory would require perfect "pension portability"--the right of any departing employee to take funds contributed on his or her behalf to that employee's new benefit fund. If the employee cannot take his or her benefits along, the fund ceases to be for the exclusive benefit of the contributing employees, and it begins to suffer from structural defect.
 
 
 60
 For example, in Demisay v. Local 144 Nursing Home Pension Fund 935 F.2d 528 (2d Cir.1991), an employer withdrew from a multiemployer pension fund. The employer's employees sought to have that multiemployer pension fund disgorge monies proportionate to contributions made on their behalf because, they claimed, failure to do so would result in the fund being structurally defective. They alleged this structural defect because the fund from which they had withdrawn would no longer be for the benefit of all employees, but would instead be for a smaller number of employees. The Second Circuit agreed and required that the fund disgorge a proportionate share of the monies in the fund to the employees' new fund because "the only way that [the employees] could ever receive the sole and exclusive benefit of their employers contributions to the funds would be to mandate a reallocation of reserves...." Id. at 534.
 
 
 61
 However, because of the actuarial and practical difficulties involved, courts have never required that pension and welfare funds disgorge a perfectly proportionate amount for each beneficiary who departs before the vesting of his or her rights. As the Second Circuit explained in O'Hare v. General Marine Transport Corp., 740 F.2d 160, 173 (2d Cir.1984):
 
 
 62
 To claim that monies retained by the Funds contributed by an employer on behalf of all of its employees is not contributed 'for the sole and exclusive benefit of the employees of such employer' whenever some of the employees choose to leave the union and fund would be an unfair and unrealistic construction of section 302(c)(5). This is especially true when considering pension funds, where financing is based on long-range actuarial projections and vesting requirements which assume that some employees for whom contributions are made will never be eligible for benefits.
 
 
 63
 This case requires us to define precisely those situations that require a pension fund to provide a proportionate share of its assets to departing members. Beginning at the extremes, if all of the beneficiaries of a fund depart its coverage, then the fund suffers from a structural defect. See Local 50, 561 F.Supp. at 213-14. This is evident not only from the caselaw, but from the plain wording of the statute. If a fund is no longer designed to serve the benefit of any employees, then it clearly is not for the sole and exclusive benefit of employees and violates the requirements of 302(c)(5), rendering it structurally defective under the LMRA. In contrast, if one individual leaves a local and the coverage of a pension fund for his or her own reasons, that individual is not, except in unusual circumstances, entitled to a proportionate share of the pension's funds. See Local 5 v. Mahoning & Trumbull County Building Trades Welfare Fund, 541 F.2d 636, 639 (6th Cir.1976).
 
 
 64
 This is an intermediate case; while numerous employees departed the coverage of a benefit fund, many more remained. We must determine when, in such intermediate situations, the benefit fund incurs a duty to disgorge an aliquot share of its funds to provide for coverage of the departing employees in their new benefit fund. Obviously, benefit funds in such situations do remain for the sole and exclusive benefit of employees, but they do not remain for the benefit of all those employees who contributed to the fund.
 
 
 65
 We believe that the primary consideration in such situations should be whether failure to disgorge would force union members to choose between exercising their collective bargaining rights and forfeiting their rights to a pension or other benefit. In other words, if a fund is structured in such a way that employees, in making a genuine collective bargaining choice, must choose between retaining their benefits and having the collective bargaining agent they would prefer, that fund is structurally defective. We have implicitly endorsed this reasoning previously, see Molnar, 789 F.2d at 248, and other circuits have adopted it explicitly, see, for example, Alvares, 514 F.2d at 163. We now hold that in cases where fund beneficiaries are faced with an untenable choice and must sacrifice their rights to choose a collective bargaining agent freely in order to secure monies from a benefit fund, the structure of the fund they are departing should be considered defective.[13]
 
 
 66
 With these principles in mind, we turn to analyzing the alleged structural defect in this case. First, we must determine which of the plaintiff beneficiaries were in fact making a genuine collective bargaining choice when leaving the Independent for the International. Second, we must determine the nature of any defect and the required remedy with respect to both the Welfare Fund and the Pension Fund.
 
 
 67
 C. Which Employees Were Exercising Their Collective Bargaining Rights?
 
 
 68
 The plaintiffs contend that all the beneficiaries who left the Independent for the International in the period following the election are entitled to a proportionate share of the funds in the Local 22 Welfare and Pension Funds. They argue that returning to the International was their method of choosing a collective bargaining agent, and that they should not be inhibited in the free exercise of such choice by the threat that their pension and welfare benefits will be diminished or eliminated. The district court refused to order disgorgement of an aliquot share of funds because it found that those who departed the Independent for the International "voluntarily departed from the certified bargaining unit." As such, according to the district court, the departing members were not entitled to disgorgement of funds from either of the benefit funds, presumably because the departees were not exercising their collective bargaining rights.
 
 
 69
 On appeal, the plaintiffs emphasize two facts which they contend make this case especially appropriate for a finding of structural defect. First, they note that a substantial number of union members, approximately 160, departed the Independent. Second, the plaintiffs stress that the departees left the Independent for another union rather than leaving for personal reasons unrelated to the exercise of collective bargaining rights. Combining these two facts, plaintiffs submit that this case involved a collective bargaining choice by a large group of employees and that to inhibit such choice by depriving the departees of benefit monies which they helped accrue would interfere with collective bargaining rights. In formulating this argument, plaintiffs rely on cases where courts have found structural defect because a substantial number of the beneficiaries of a fund have departed pursuant to exercise of their collective bargaining rights. See, for example, Molnar, 789 F.2d 244; Alvares, 514 F.2d 156; Local 50, 561 F.Supp. at 205.
 
 
 70
 No case, however, deals with the unique situation that this case presents. Unlike the cases that the plaintiffs cite, this case does not involve a certified bargaining unit leaving a larger multiemployer fund and being unable to retain the portion of the monies in benefit funds reasonably attributable to it. Compare Alvares, 514 F.2d at 159. Nor does this case involve a situation where the designated union settlor of a fund no longer represents any beneficiaries of a fund in a collective bargaining situation. Compare Molnar, 789 F.2d at 249. Instead, the losers in one collective bargaining election chose, for various reasons, to reject the representation of the victorious union in the election and to return to the union that had previously represented them. Apparently, the departees ceased being members of the Independent for different reasons: some were part of units certified for subsequent NLRB elections; some became members of locals affiliated with the International pursuant to voluntary recognition of the International by their employers; still others apparently left because they as individuals preferred locals affiliated with the International as collective bargaining agents.
 
 
 71
 Both the plaintiffs and the defendants would have us treat all those who departed the Independent for the International identically. The plaintiffs urge that all those who left were departing as part of the exercise of their collective bargaining rights. The defendants and the district court view all those who departed as leaving for their own reasons. We believe that these polar views oversimplify the facts, and, consequently, we decline to take such a rigid view of the matter. In fact, we believe that the record shows that many different circumstances animated departure from the Independent, and we hold that the determining factor in whether plaintiff funds are entitled to a departee's share of monies in the Funds is the circumstance in which that departee left the Independent. From the current record, we can discern three different categories of departees, and we analyze each in turn.
 
 
 72
 1. Employees Who Departed Pursuant to NLRB Elections
 
 
 73
 First, some number of employees who were employed by FHC, one of the companies outside the Contractors Association, chose to leave the Independent and to become part of the International as part of an election conducted by the National Labor Relations Board.[14] After these employees had selected International Local 28 in a March 1984 election, the NLRB certified it as the bargaining agent for those employees in September 1985. The employees at FHC had the option of choosing Independent Local 22 as their bargaining representative in that election, but they did not. Consequently, we believe that the free exercise of collective bargaining rights was potentially inhibited by Independent Local 22's refusal to provide a proportionate share of monies to those who departed after the FHC election.
 
 
 74
 We reach this conclusion because there is no clearer exercise of collective bargaining rights than the choice of one collective bargaining representative over another through an election conducted by the NLRB. And, although the unit membership did in fact select International Local 28 over Independent Local 22 in this instance, we believe that it would in the usual case act as a significant inhibitor of employee free choice if we did not provide for disgorgement of a proportionate share of monies from the Local 22 Pension and Welfare Plans to provide for coverage of these employees. Requiring disgorgement to protect employee free choice in the exercise of their collective bargaining rights is consistent with the holdings of other courts. See Local 50, 561 F.Supp. at 214-16.
 
 
 75
 We note that on the facts of this case, employees may not have had to face as stark a choice between their pensions and their collective bargaining rights as they might in another case. This is so because the International pledged to provide an identical benefit package to those who departed the Independent for the International, thus allowing employees to choose freely between the two bargaining representatives without considering that their pension funds might be lost. In other cases, however, the opposing union may not have the ability to provide the same coverage that the former union provided, and contributions made on behalf of employees to benefit funds will be lost because of their decision to choose a different bargaining representative. Consequently, we believe that the International's decision to offer its membership the same benefit package they would have had if they remained with the Independent should not affect our analysis of whether a structural defect arose in the Independent Local 22 Funds. Regardless what action the new fund takes, the old fund suffers from a structural defect if the fund no longer serves the sole and exclusive benefit of employees.
 
 
 76
 Consequently, we hold that the Independent Local 22 Welfare and Pension Funds suffer from a structural defect with respect to those employees who departed the Independent for locals affiliated with the International pursuant to an NLRB election. On remand, the district court should determine the precise number of employees in this category.
 
 
 77
 2. Employees Who Departed After Voluntary Recognition By an Employer
 
 
 78
 Similarly, we believe that the International's fund is entitled to a proportionate share of the monies in the Independent Funds with respect to a second category of departees, those who left Independent Local 22 after their employers voluntarily recognized International Local 28 as the bargaining agent for employees at their respective employers' plants.[15] While no election was held for these employees, we believe that such voluntary recognition was nonetheless the product of the exercise of collective bargaining rights.
 
 
 79
 The precedents of this court and of the National Labor Relations Board compel us to hold that valid voluntary recognition of a bargaining agent by an employer has the same effect as an election wherein employees select their collective bargaining representative. See NLRB v. Cardox Division of Chemetron Corp., 699 F.2d 148, 156 (3d Cir.1983) ("This court recognizes the value of voluntary recognition agreements in the collective bargaining process. We also adhere to the basic policy that a company and a union must be held to their agreements if those agreements are consistent with the Act."). See also, Jeer-Dan Corp., 237 NLRB 302, 303 (1978), enforced 601 F.2d 575 (3d Cir.1979). Therefore, we direct the district court to determine the number of employees who left Independent Local 22 for International Local 28 after voluntary recognition of Local 28 by their employers.
 
 
 80
 3. Employees Who Departed For Different Reasons
 
 
 81
 We believe that a different principle should apply regarding the remainder of the employees who departed the Independent. The record does not reflect that these employees left the Independent for reasons related to the appropriate exercise of their collective bargaining rights. Unlike those who left after an election or after a campaign leading to voluntary recognition, employees in this third category left as a result of their individual decisions. They were part of a losing election campaign but, because of the unusual fact situation of this case, were able efficaciously to transfer their allegiance from the victorious union to the losing union. While they were certainly entitled to do so, we do not believe that such conduct entitles the fund of the local to which they transferred to recover a proportionate share of the funds of the union that they chose to leave.
 
 
 82
 The plaintiffs attempt to avoid this result by arguing that the employees who departed pursuant to neither an election or voluntary recognition were nonetheless exercising collective bargaining rights. They emphasize that these employees, in leaving the Independent for the International, did choose one union over another. Although that is true, the labor laws do not protect each individual's right to select a union as such, but rather protect collective choices that are valid and recognized under the Act. As one treatise has commented:
 
 
 83
 One of the prime goals of the National Labor Relations Act was to effectuate free choice for employees with respect to the issue of union representation. However, because the Act contemplated a system of exclusive representation for all employees in a bargaining unit, freedom of choice was from the beginning a majoritarian rather than an individual concept.
 
 
 84
 Julius Getman & Bertrand Pogrebin, Labor Relations 16 (Foundation 1988). We hold that employees have no right to carry funds attributable to them with them when they depart a fund for reasons unrelated to the exercise of collective bargaining rights.
 
 
 85
 The plaintiffs also emphasize that, after the dissolution of Local 22 SMWIA and the NLRB's decision, there was no valid successor to that union, and employees were left to choose between Independent Local 22 and Local 28 SMWIA. They claim that the uniqueness, or at least the fluidity, of this situation entitles them to pension portability. All the departing employees, however, were encompassed within the terms of the HBA agreement calling for an election. That agreement provided on its face that it would be binding "as if the election had been conducted by the NLRB itself." Although some of the membership of Independent Local 22 acted collectively to leave the Independent (i.e., through elections and voluntary recognition), the remainder of employees apparently left for their own reasons. At least there is no evidence in the record supporting any other view. Hence, we hold that those in this third category are not entitled to carry with them their aliquot share to their benefit funds in the International.
 
 
 86
 In sum, we hold that there is a structural defect in the funds with respect to those employees in the first two categories, although not the third.
 
 
 87
 D. Remedies For Structural Defect in the Welfare and Pension Funds
 
 
 88
 Having determined that structural defects exist in the Independent Local 22 benefit funds, we must decide whether they exist in both the Welfare Fund and the Pension Fund and, if so, what remedy is required. Because the eligibility requirements and the method of payment are different, each fund presents unique problems that we must address.
 
 1. The Pension Fund
 
 89
 With respect to the Pension Fund, the defendants argue that because all vested pension rights of departing employees have been or will be satisfied, no structural defect exists in the fund. Those beneficiaries who worked in Local 22 long enough to have rights to pensions vest will still receive those pensions from the National Pension Fund; those whose rights never vested, according to the defendants, have no entitlement to a pension, and the failure of the Pension Fund to grant them any monies is consistent with the terms of the Pension Fund plan. In deciding for defendants, the district court accepted this logic.
 
 
 90
 As prior cases have made clear, however, a fund's fulfillment of its responsibility to pay vested benefits is not inconsistent with structural defect in a fund. See, for example, Alvares, 514 F.2d at 165 ("The plaintiffs here are not seeking individual specific benefits that have been denied them. They seek a determination that, as a group, the members have interests in the trust as a whole which have been denied to them."). Instead, the critical question is whether some amount that departing employees have helped accumulate in a fund is being denied to those employees' new pension fund because the employees exercised their collective bargaining rights to choose a new bargaining representative and fund. We believe that this is such a case.
 
 
 91
 The structural defect here is somewhat subtle and manifests itself in two ways. First, there is a structural defect in the Independent Local 22 Pension Fund with respect to those employees who departed the Independent for locals affiliated with the International pursuant to the exercise of collective bargaining rights before they ever obtained vested rights to a pension with the Independent Pension Fund. Although those employees who worked less than ten years in Local 22 before their departure did not obtain vested rights to a pension, the structural defect doctrine requires that a proportionate share of the monies accumulated in the fund as a result of contributions made on their behalf be transferred to their new fund. If this were not done, the monies in the fund would be for the "sole and exclusive benefit" of some employees, but not all of those who contributed. Although, as we suggested in our earlier discussion of the structural defect doctrine, this kind of disparity is inevitable and tolerable in some situations, it is impermissible where the departing members lose their contributions pursuant to the exercise of their collective bargaining rights. On remand, the district court should determine what amount in the Pension Fund is attributable to those employees who never obtained vested pension rights and who departed for reasons that would give rise to a structural defect, as discussed in Section III.C above.
 
 
 92
 Second, there remains the possibility of structural defect with respect to those employees who left the Independent for locals affiliated with the International but who had already obtained vested pension rights in the Independent Local 22 Fund. Plaintiffs allege that individuals with vested pension rights who remained with the Independent received increased benefits from the Pension Fund that were denied to those who departed solely because they departed. The district court made no finding of fact on this point, and we are not certain whether these alleged increases in fact took place or whether, if such increases did take place, they were attributable to contributions made on behalf of employees who left Independent Local 22 for locals affiliated with the International. We leave it to the district court on remand to determine whether the treatment of any employees with vested pension rights gives rise to a structural defect in the Independent Local 22 Pension Fund. On remand, the district court should determine whether there is any distinction in benefits between those who departed and those who remained and who are otherwise identically situated vested beneficiaries of the Pension Fund.[16] If such a difference exists, and the additional benefits that remaining beneficiaries receive are attributable to contributions made on behalf of the vested departees, then the Pension Fund suffers from a structural defect and the district court should fashion appropriate relief.
 
 2. The Welfare Fund
 
 93
 With respect to the Welfare Fund, the defendants emphasize that that Fund provided coverage for departing employees for the first six months after departure. Under the terms of the Welfare Fund Plan, employees did not receive welfare benefits until six months after employers began to make contributions on their behalf; in turn, employees received coverage for six months after employers ceased making contributions on their behalf. The defendants claim that under this structure of benefit funds, even if employees were exercising their collective bargaining rights in choosing another union, no structural defect exists in that fund now because the fund provided coverage to departees for the amount of time that plaintiffs contributed.
 
 
 94
 Despite the intuitive appeal of this argument, we believe that the six-month period of post-departure coverage did not necessarily dissolve the structural defect in the Welfare Fund. We reach this conclusion in part because of the manner in which the Welfare Fund operates. The Welfare Fund in this case took in monies from employers based on the number of hours that covered beneficiaries worked for those employers, and paid out benefits to beneficiaries as the beneficiaries incurred costs from a covered illness or accident. Although providing coverage for six months after the departees ceased contributing to the funds would seem to provide sufficient coverage to employees, we believe such a finding may be too facile and might result in an injustice towards the departing beneficiaries. Although the district court made no finding on this point, the plaintiffs have offered some evidence that the Welfare Fund built up sufficiently high reserves that it was, in a sense, operating at a "surplus." While plaintiff-beneficiaries were not refused coverage for the six months after they departed, according to them, their departure deprived them of any right to enjoy the benefit of this supposed surplus, which might have resulted in bonus benefits at a later time. This surplus, they say, was created in part thanks to contributions made on their behalf. If this is so, we cannot be certain that the post-departure coverage absolved defendants of all responsibility to disgorge funds merely because they provided coverage for a time beyond when plaintiff beneficiaries were contributing to the funds.
 
 
 95
 We are incapable of determining on the basis of the current record whether such a surplus existed or, indeed, from an actuarial perspective, whether such a surplus makes conceptual sense. Consequently, the district court should make a finding of fact, based on any evidence in the record or other evidence that the parties seek to offer on this point, as to what amount (if any) of the Welfare Fund was a "surplus" amount. Upon making that finding of fact, the district court should determine what amount of that surplus, if any, was attributable to the departing employees on whose behalf plaintiffs are entitled to disgorgement, as explained above in Section III.C. The plaintiff funds are entitled to disgorgement from the Local 22 Welfare Fund in that amount.
 
 IV. CONCLUSION
 
 96
 We agree with the district court that the defendants have not violated their fiduciary duties, but we conclude that the Pension Fund contains a structural defect and that the Welfare Fund may as well. We will, therefore, reverse the district court's entry of judgment in favor of the defendants. We will remand the actions to the district court for it to determine the number of employees who departed the Independent for the International pursuant to the valid exercise of collective bargaining rights. The district court shall, consistent with this opinion, determine the amount in both the Welfare Fund and the Pension Fund that should be transferred to the plaintiff funds. The parties shall bear their own costs, see FRAP 39(c).
 
 
 
 *
 The Honorable Daniel H. Huyett, 3rd, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 In addition, the members of SMWIA Local 22 working in Sussex County would be transferred into SMWIA Local 19. Local 19 is not a party to this suit
 
 
 [2]
 Several factors are important in determining whether a local is an appropriate successor to a union, including whether "democratic procedures have been followed in any vote on affiliation or merger, whether the new organization has succeeded to the assets and liabilities of the predecessor, whether the employees in the bargaining unit have had an opportunity to register their desires and whether there is a continuity in the leadership and representation of the employees in the bargaining unit." Local 294, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Gene Graham Ford, Inc.), 188 NLRB 515, 518 (1971)
 
 
 [3]
 Sections 9(a) and (b) of the LMRA, 29 USC § 159(a), (b) (1988), require that the Board conduct elections only in appropriate units, which consist of the employer unit, the craft unit, or the plant unit. In this case, however, the Regional Director permitted Independent Local 22 to name the members of the Contractors Association as a single employer
 
 
 [4]
 None of the unaffiliated employers were party to the election because they were not participants in the petition before the NLRB, and they did not sign the stipulation for election
 
 
 [5]
 Plaintiffs have alternatively cast this argument as a breach of fiduciary duty argument under ERISA and as a structural defect argument under Section 302(c)(5) of the LMRA and Section 404 of ERISA. As we discuss below, we reject the contention that the designation of the union settlor as Independent Local 22 gave rise to a structural defect. As we discuss in Section III, we have applied the structural defect doctrine with respect to settlors only in those cases where the designated settlor no longer represents as a collective bargaining agent any of the beneficiaries of a fund. See, for example, Molnar v. Wibbelt, 789 F.2d 244, 249 (3d. Cir.1986). Here, the newly designated settlor of the fund, Independent Local 22, represented a substantial portion of the beneficiaries of the Welfare Fund and the Pension Fund. The more troubling consideration, as we discuss in Section II, is whether altering the designation of the settlor violated any fiduciary duty under ERISA
 
 
 [6]
 The cases that plaintiffs cite to support their contention that "collective bargaining agent" cannot include the right to be settlor of benefit funds do not persuade us. In Teamsters Local 169 v. Teamsters Health & Welfare Fund, 327 F.Supp. 260 (E.D.Pa.1971), the term "collective bargaining agent" was not the term construed by the court. Even if the terms were the same, the court was construing the term in the original plan document rather than construing an agreement entered into between two unions to determine which would represent employees
 Similarly, in Sinai Hospital of Baltimore v. National Benefit Fund for Hospital & Health Care Employees, 697 F.2d 562 (4th Cir.1982), the plaintiffs sought to enjoin an alteration to the trust agreement where the collective bargaining agreement forbade such an alteration. Because the original plan documents did not allow for alteration in the plan documents through a collective bargaining agreement, the court denied the plaintiffs' request. In the present case, the plan documents do not contain such a prohibition on amendment through subsequent agreement.
 
 
 [7]
 The plaintiffs rely on evidence regarding campaign literature distributed by Local 27 which indicated that "serious doubt exists as to whether [Independent Local 22] can take your pension monies." We are not persuaded. To us, that evidence does not suggest that the International was saying that control of the benefit funds was not at stake in the election. It merely suggests that Independent Local 22 could not interfere with vested pension and benefit rights, an issue not in dispute in this case. At all events, we owe deference to the district court's factual finding, which was substantiated by other evidence
 
 
 [8]
 The plaintiffs argue that on this point the district court erroneously considered a letter written by defendants' counsel in this case. The letter, dated June 3, 1982, stated that counsel for defendants believed at that time that control of the pension funds was at stake in the September 1982 election. See text at page 1201. Plaintiffs urge that the district court's consideration of this letter requires reversal because it made counsel a witness in his own case, a practice we have condemned, see Universal Athletic Sales Co. v. American Gym, 546 F.2d 530, 538 (3d Cir.1976). Whatever the intrinsic merit of this argument, in this case we find it unavailing because the district court did not rely on this letter to support its finding that control of the Pension and Welfare Funds was at stake in the HBA election. Instead, the district court based its decision on "the campaign literature and the testimony of various witnesses."
 
 
 [9]
 Indeed, we note that failure to change the designation of the union settlor to Independent Local 22 might have been even more problematic from a policy perspective because an overwhelming majority of the beneficiaries of the Welfare Fund and the Pension Fund were members of Independent Local 22 rather than of locals affiliated with the International. Even had the parties not intended to change the designation of the union settlor, allowing a collective bargaining agent that has been overwhelmingly rejected by its rank and file to serve as union settlor may, in certain circumstances, be improper. See Molnar, 789 F.2d at 248 (finding structural defect where union settlor was no longer collective bargaining agent for the beneficiaries). Given that the election results authorized the trustees to change designation of the union settlor to Independent Local 22, we need not decide whether, in the absence of such an authorization, the funds would nevertheless have been required to change the designation of the settlor to the union that represented the majority of the fund's beneficiaries
 
 
 [10]
 The plaintiffs also urge that the NLRB's holding that Independent Local 22 was not a "successor" to Local 22 SMWIA requires that we hold that Independent Local 22 could not be the union settlor for the Local 22 benefit funds. See American Enka Co., 231 NLRB 140 (1977). While we agree that the Independent was not a successor for bargaining purposes, this has no impact on the determination whether altering the designation of the union settlor of the funds was a breach of fiduciary duty. Successorship rights only give a collective bargaining agent the right to be treated the same as the prior bargaining agent with respect to bargaining and recognition. In this case, the NLRB determined that there was no successor. Therefore, the Independent and the locals affiliated with the International were required to seek recognition anew. They did so by agreeing to a private election, and they also put the issue of control of the Welfare Fund and the Pension Fund at stake in that election. The NLRB's determination that Local 22 SMWIA had no successor did not preclude changing the designation of the union settlor to the union that now represented a majority of the funds' beneficiaries
 
 
 [11]
 Compare, for example, Local Union No. 5 v. Mahoning and Trumbull County Building Trades Welfare Fund, 541 F.2d 636, 639 (6th Cir.1976) (finding no structural defect although employees were faced with choice between losing benefits or being represented by a collective bargaining agent not of their choosing) with Local 50, 561 F.Supp. at 215 (finding structural defect in similar situation)
 
 
 [12]
 In the past, courts distinguished between the establishment of a fund and its continued existence. One case held that a fund was not structurally defective if, at its establishment, it satisfied the stated requirements of § 302(c)(5). See Fiorelli v. Kelewer, 339 F.Supp. 796, 801 (E.D.Pa.1972), affirmed mem., 474 F.2d 1340 (3d Cir.1973). It is now recognized, to the contrary, that a fund can be structurally defective in its continued operation and that the defect need not have arisen at the establishment of the fund. See Local 50, 561 F.Supp. 205 (E.D.N.Y.1983)
 
 
 [13]
 While Section 302(c)(5) does not on its face articulate the concern of protecting freedom of choice in collective bargaining, reliance on that consideration in structural defect cases has a long history. See Local 50, 561 F.Supp. at 214. Although Congress enacted Section 302, in part, to prevent employers from bribing union officials and unions from extorting employers, see Alvares at 163, the jurisdiction of the federal courts to enforce the section expanded beyond that narrow concern, see id. (citing cases). One situation where courts have invoked jurisdiction is when employee free choice to exercise collective bargaining rights is inhibited by the structure of a fund. See Local 50, 561 F.Supp. at 214. This is rooted in the policy concern of protecting employee free choice, articulated throughout the labor statutes. See Alvares, 514 F.2d at 163
 
 
 [14]
 The record does not reflect precisely how many. At oral argument, counsel for plaintiffs indicated he believed the number to be between 30 and 40, but this will be an appropriate matter for the district court's determination on remand
 
 
 [15]
 Again, the precise number of employees in this category is unclear from the record. At oral argument, counsel for plaintiffs indicated that he believed the number to be between 20 and 30
 
 
 [16]
 The defendants do not raise the argument that a transfer of funds from the Independent Local 22 Pension Fund to the SMWIA National Pension Fund would violate Section 4235 of ERISA, 29 USC § 1415 (1988), which governs transfers pursuant to a change in bargaining representative. At all events, we do not believe that that provision of ERISA, which is designed to prevent financial insolvency in multiemployer funds, see Carl Colteryahn v. Western Pennsylvania Teamsters Pension Fund, 847 F.2d 113 (3d Cir.1988), precludes a transfer of monies from one fund to another upon a finding of structural defect under Section 302(c)(5) of the LMRA